UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ICE PORTAL, INC.,
a Florida corporation

        Plaintiff,

v.

VFM LEONARDO INC.,
a foreign corporation,

        Defendant.

_____/

CASE NO. **09 - 60230**

CIV ALTONAGA
MAGISTRATE JUDGE
BROWN

## COMPLAINT

### PRELIMINARY STATEMENT

Plaintiff ICE PORTAL, INC. ("ICE Portal"), by and through its undersigned

counsel, hereby sues Defendant VFM LEONARDO INC. ("VFM Leonardo"), for

breach of contract, unjust enrichment, and tortious interference with advantageous

business relationship, and in support thereof states the following:

### JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. Section 1332(a)(2), where the controversy arises between a citizen of a State and

a subject of a foreign state, and the matter in controversy exceeds the sum or value of

$75,000.00, exclusive of interest and costs.

2.    This Court has personal jurisdiction over VFM Leonardo pursuant to the

Florida Long-Arm Statute, where VFM Leonardo engages in substantial business in the

State of Florida and where VFM Leonardo caused tortious injury to ICE Portal within

the State of Florida by acts occurring within the State of Florida and by acts having

direct effects within the State of Florida.  Fla. Stat. § 48.193 (2008).  Sufficient

minimum contacts exist for the constitutional exercise of personal jurisdiction where

VFM Leonardo acted knowing that its actions would have harmful effects on ICE Portal in the State of Florida.

3. Venue is proper (i) pursuant to 28 U.S.C. Section 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, (ii) pursuant to 28 U.S.C. Section 1391(a)(3) because VFM Leonardo is subject to personal jurisdiction in this district, and (iii) 28 U.S.C. Section 1391(d) because an alien is subject to suit in any district.

## PARTIES

4. Plaintiff ICE Portal is a Florida corporation with a principal place of business at 3595 Sheridan Street, Suite #200, Hollywood, Florida 33021.

5. Defendant VFM Leonardo is organized under the laws of the Province of Ontario, Canada, with a principal place of business at 111 Peter Street, Suite 530, Toronto, Canada M5V2H1. VFM Leonardo is registered with the Florida Secretary of State as a foreign corporation doing business in the State of Florida

## FACTS

6. On or about October 31, 2007, Plaintiff ICE Portal entered into an Strategic Partner Agreement (the "Partner Agreement") with Leonardo Media Services B.V. ("Leonardo") to cooperatively deliver a greater spectrum of services to each party's travel suppliers and distribution partners. Pursuant to the terms of the Partner Agreement, each party would receive 15% of the revenue collected as a result of referral by the other. A copy of the Partner Agreement is attached hereto as Exhibit A.

7. The Partner Agreement stated a term of one year, expiring on October 31, 2008.

8. Under the auspices of the Partner Agreement, in November 2007, Leonardo asked ICE Portal to create virtual tours of the meeting facilities of Leonardo's

client, Intercontinental Hotel Group ("IHG"). ICE portal was likewise asked to host the virtual tours and distribute such virtual tours through digital brochures.

9.     On or about October 2, 2008, ICE Portal and Leonardo signed an Addendum to the Partner Agreement for IHG Virtual Tour Distribution ("Virtual Tour Agreement"). The Virtual Tour Agreement extended the relationship among Leonardo, IHG, and ICE Portal for an additional twelve months. A copy of the Virtual Tour Agreement is attached to this Complaint as Exhibit B.

10.     ICE Portal complied and continues to comply with its obligations under both the Partner Agreement and the Virtual Tour Agreement, providing IHG with the requested services through the present day.

11.     The Virtual Tour Agreement includes a negotiated provision that provides, "[i]n the event that Leonardo should undergo a change of ownership [or] control, this agreement shall survive for a minimum of the initial period [one year]."

12.     The terms of the Virtual Tour Agreement required Leonardo to periodically invoice IHG and to pay ICE Portal within 30 days of payment receipt from IHG.

13.     Two invoices were issued by ICE Portal to Leonardo pursuant to the Virtual Tour Agreement. The first was issued on October 20, 2008, in the amount of $24,406.25, and was promptly paid by Leonardo. Upon the instructions of Leonardo, a second invoice was issued on November 1, 2008, in the amount of $40,187.50. This amount remains outstanding.

14.     On or about November 4, 2008, Leonardo was acquired by VFM Interactive Inc. ("VFM"), one of ICE Portal's main competitors in the provision of rich content services. At the time of the acquisition, ICE Portal was notified by VFM Leonardo that it had assumed all obligations and responsibilities of Leonardo.

3

15.     Despite repeated demands, VFM Leonardo has thus far refused to pay the outstanding invoice for $40,187.50.

16.     By letter dated December 23, 2008, and in direct violation of the terms of the Virtual Tour Agreement, VFM Leonardo indicated its intent to terminate that agreement and demanded that ICE Portal immediately cease its development, hosting, and distribution obligations to IHG (as third-party beneficiary) thereunder. A copy of the demand letter is attached hereto as Exhibit C.

17.     ICE Portal continues to comply with its obligations under the Virtual Tour Agreement, in accordance with the provisions thereof which, *inter alia*, provide for the survival of the Virtual Tour Agreement for a minimum of the initial term in the event of a change of ownership or control in Leonardo.

18.     ICE Portal holds a reasonable expectation of $74,850.00 in revenue, exclusive of interest, additional costs, or attorney's fees, from the balance of the intitial term of the Virtual Tour Agreement.

19.     During regular business communications relating to services being cooperatively provided by Leonardo and ICE Portal, representatives of IHG approached ICE Portal regarding its ability to provide additional consulting services for IHG.

20.     After several months of regular meetings and discussions regarding the envisioned consulting services, a final agreement between IHG and ICE Portal was reached on or about November 18, 2008 (the "Consulting Services Agreement"). The agreement was immediately executed by ICE Portal and sent to IHG for final signature. A copy of the Consulting Services Agreement is attached to this Complaint as Exhibit D.

21.     Despite repeated assurances that IHG would execute the Consulting Services Agreement, on or about December 15, 2008, IHG informed ICE Portal that it could no longer engage ICE Portal for the envisioned consulting services.

22.     Representatives of IHG subsequently revealed that VFM Leonardo had improperly and forcefully demanded that IHG sever all relations with ICE Portal, resulting in significant detriment and damage to its competitor, such providing the basis for the claims asserted herein.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Breach of Contract

23.     ICE Portal re-asserts paragraphs 1 through 22 as if fully set forth herein.

24.     On or about October 2, 2008, ICE Portal entered into the Virtual Tour Agreement with Leonardo to create, host, and distribute virtual tours for IHG.

25.     ICE Portal performed under the Virtual Tour Agreement by developing, hosting, and distributing the contemplated virtual tours.

26.     VFM Leonardo breached the Virtual Tour Agreement by failing to pay an invoice issued on November 1, 2008, in the amount of $40,187.50.

27.     VFM Leonardo further breached the Virtual Tour Agreement by improperly attempting to terminate in defiance of the Virtual Tour Agreement's explicit survival provision in the event of a change of ownership or control of Leonardo.

28.     As a result of VFM Leonardo's actions, ICE Portal has been damaged in the amount of $40,187.50 for failure to pay for services rendered and $74,850.00 in expected revenues under the balance of the Virtual Tour Agreement.

WHEREFORE, Plaintiff ICE Portal demands judgment in its favor, the awarding of damages in the amount of $115,037.50, plus applicable interest, reasonable

attorney's fees and costs, and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### Unjust Enrichment

29.     ICE Portal re-asserts paragraphs 1 through 22 as if fully set forth herein.

30.     ICE Portal conferred and continues to confer a benefit on VFM Leonardo by providing services under the Virtual Tour Agreement.

31.     VFM Leonardo accepted and appreciated the benefit provided by ICE Portal (and continues to do so), collecting payment from IHG, but failing to remit payment to ICE Portal for services rendered.

32.     It would be inequitable for VFM Leonardo to retain the benefit of ICE Portal's services and the revenue resulting therefrom without paying for them.

WHEREFORE, Plaintiff ICE Portal demands judgment in is favor, the awarding of damages in the amount of $115,037.50, plus applicable interest, reasonable attorney's fees and costs, and such other and further relief as this Court deems just and proper.

## THIRD CLAIM FOR RELIEF

### Tortious Interference with Advantageous Business Relationship

33.     ICE Portal re-asserts paragraphs 1 through 22 as if fully set forth herein.

34.     ICE Portal had an ongoing business relationship with IHG.

35.     VFM Leonardo had knowledge of ICE Portal's relationship with IHG and of the imminent execution of the Consulting Services Agreement between them.

36.     VFM Leonardo intentionally and unjustifiably interfered with the business relationship between ICE Portal and IHG by demanding that IHG cease all relations with ICE Portal and otherwise influencing IHG to do same.

37.     VFM Leonardo's unjustified interference was conducted with the express motive and intention of damaging the business of a competitor in favor of its own commercial interests.

38.     ICE Portal has been damaged as a result of the breach of its relationship with IHG in the approximate amount of $670,000.00.

WHEREFORE, Plaintiff ICE Portal demands judgment in its favor, the awarding of damages in the amount of $670,000.00, plus applicable interest, reasonable attorney's fees and costs; and such other and further relief as this Court deems just and proper.

Dated this 12th day of February, 2009.

Respectfully submitted,

**HARPER MEYER**
701 Brickell Avenue, Suite 1400
Miami, Florida 33131
Telephone: +1 (305) 577-3443
Facsimile: +1 (305) 577-9921
Email: pjoconnor@harpermeyer.com

By: _____
Patrick J. O'Connor
Florida Bar No. 0715778

# EXHIBIT A

## STRATEGIC PARTNER AGREEMENT

Leonardo and ICE Portal

### OCTOBER 2007

Leonardo / ICE Strategic Partnership Agreement – October 26, 2007 - Company Confidential

## 1.0 Introduction

Leonardo is a leading content management, e-marketing and content distribution service for the travel industry with a focus on static content (photos, maps, graphics, text, etc.) and moving content (in the form of Image/WebGalleries), aggregation, management and delivery to travel distribution intermediaries (GDS) and direct to travel channels (OTA, Search Engines, Meta-search Engines).

ICE Portal, a content production, management and distribution solution for travel suppliers & distributors offers a similar service, but specializes in rich media (360 virtual tours, flash webshows, streaming videos) production, hosting and delivery directly to 3rd party websites.

Leonardo & ICE Portal wish to enter into a marketing and distribution agreement to deliver a greater spectrum of services for travel suppliers and distribution partners. In phase 1, this would entail a reciprocal arrangement whereby Leonardo distributes links to ICE rich content to it's channels and ICE distributes links to Leonardo WebGalleries to it's channels.

Both companies believe that by jointly offering each others services – in combination - will deliver greater value to existing and new clients. The Agreement is expected to capture greater market share for both parties.

This agreement summarizes the commercializing of the relationship, responsibilities, marketing strategies and profit sharing.

The agreement will be a phased approach:

Phase 1 – based on mutual development to support the ability to reciprocal distribution of 'moving' content to each others channels To be completed by December 31, 2007
Phase 2 - Ability for static images from Leonardo to appear in ICE digital brochures To be completed by March 31, 2008.

## 2.0 Current Services:
Both parties currently operate in the space of production, management & distribution.   The following charts show for which products this is supported.

### 2.1 Leonardo Services

| Product | Production | Management | Aggregation | Distribution |
|---|---|---|---|---|
| Static Images | | X | X | X |
| Animated Stills (Image Gallery) | X | X | X | X |
| Moving   Content (WebGallery) | X | X | X | X |
| 360's | | | | X* |
| Video | | | | X* |

*to brand.com websites only.

## 2.2 ICE Portal

| Product | Production | Management | Aggregation | Distribution |
|---|---|---|---|---|
| Static Images | X | X | X | X |
| Animated Stills | | | X | |
| Moving   Content (Webshows) | X | X | X | X |
| 360's | X | X | X | X |
| Video | X | X | X | X |

N.B. The difference between an ICE Webshow and a Leonardo WebGallery is that ICE manually crafts the movement across each of the images and Leonardo automates the movement across the image. Both products have audio options.

## 3.0 Distribution

The prime focus of the strategic partnership in phase 1, is for both ICE and Leonardo to accelerate the broadening of the distribution network, by leveraging each parties existing relationships with channels and both parties delivering each others rich content. This will add value to the hotel proposition and enable both ICE and Leonardo to sell more of their products.

The agreement is that Leonardo will incorporate the links into their ChannelBank feeds for the following ICE products:
- Webshows
- 360
- Video

ICE agree to incorporate Leonardo links into their relevant channel feeds for the following Leonardo products:
- WebGallery
- ImageGallery (where strategically relevant)

In all instances the source (owner) of the content will be responsible for the hosting and serving of the content. The distributor is the vehicle by which the URL's are delivered to the respective channels.

For the purposes of this document these products will collectively be called 'rich' content products. Costs associated with distribution through the ICE and Leonardo networks is outlined in Schedule B.

**4.0 Channel Matrix**

Where both parties hold an established relationship with a channel, both parties will feed their own content. However where one party has an established relationship and the other party does not, the existing feed will be responsible for the delivery the 'joint rich content' of both parties (ICE and Leonardo). N.B. Rich content delivery is subject to channel acceptance.

The matrix below proposes which entity should feed the combined or 'joint rich content' v occasions whereby each entity will feed the channels their own content.

| Channel | Delivery by ICE | Delivery by Leonardo |
|---|---|---|
| AARP | Joint Rich Content | |
| AMERICAN EXPRESS | Joint Rich Content | |
| AOL | ICE Rich Content | Leonardo Rich Content |
| APPLE VACATIONS | Joint Rich Content | |
| CERTIFIED VACATIONS | Joint Rich Content | |
| ebY | ICE Rich Content | Leonardo Rich Content |
| Expedia.com | Joint Rich Content | |
| GOGO | Joint Rich Content | |
| Google Maps | ICE Rich Content | Leonardo Rich Content |
| Groople | Joint Rich Content | |
| Hotel & Travel Index www.hotravelnk.com | ICE Rich Content | Leonardo Rich Content |
| KAYAK | ICE Rich Content | Leonardo Rich Content |
| LIBERTY TRAVEL | Joint Rich Content | |
| THE MARK TRAVEL CORPORATION | Joint Rich Content | |
| OneTravel | Joint Rich Content | |

| | | |
|---|---|---|
| ORBITZ | ICE Rich Content | Leonardo Rich Content |
| Passport Online | Joint Rich Content | |
| Pegasus | ICE Rich Content | Leonardo Rich Content |
| Pleasant Holidays | Joint Rich Content | |
| PREVU | Joint Rich Content | |
| priceline.com | Joint Rich Content | |
| REZCONNECT | Joint Rich Content | |
| | Joint Rich Content | |
| starCITE | Joint Rich Content | |
| SideStep The leading travel search engine | ICE Rich Content | Leonardo Rich Content |
| Travel Impressions | Joint Rich Content | |
| travelocity | ICE Rich Content | |
| tripadvisor | Joint Rich Content | |
| Vacation | Joint Rich Content | |
| Vacations To Go.com | Joint Rich Content | |

| | | |
|---|---|---|
| VacationAccess The Travel Pro's Best Friend | Joint Rich Content | |
| WorldChoiceTravel.com | Joint Rich Content | |

| | | |
|---|---|---|
| YAHOO! TRAVEL | ICE Rich Content | Leonardo Rich Content |
| zuji | ICE Rich Content | Leonardo Rich Content |

| aMaDEUS | | Joint Rich Content |
|---|---|---|
| GALILEO | | Joint Rich Content |
| worldspan | | Joint Rich Content |
| Sabre \| Travel Network | | Joint Rich Content |
| WORLDRES | | Joint Rich Content |
| CheapTickets | | Joint Rich Content |
| nuTravel | | Joint Rich Content |
| OHG | | Joint Rich Content |
| OAG | | Joint Rich Content |
| Carlson Wagonlit | | Joint Rich Content |
| Mobil Travel Guide | | Joint Rich Content |
| REARDEN | | Joint Rich Content |
| [TRUST] trustinternational.com | | Joint Rich Content |
| bezurk | | Joint Rich Content |
| ebookers.com | ICE Rich Content | Joint Rich Content |
| lastminute.com | ICE Rich Content | Leonardo Rich Content |
| tripz.com | | Joint Rich Content |
| trx | | Joint Rich Content |
| cvent | | Joint Rich Content |

Leonardo / ICE Strategic Partnership Agreement – October 26, 2007 - Company Confidential

| ezrez ⓒ | ICE Rich Content | Joint Rich Content |
|---------|------------------|--------------------|

**Summary**
This matrix suggests that Leonardo will be able to assist ICE with an additional 16 channels and ICE will be able to assist Leonardo will an additional 25 channels.

**5.0 Technical Requirements – Phase 1**

Leonardo will encompass ICE Portal 'rich content' URL's (XML metadata) into the existing XML feeds to Leonardo channels, for channels agreeing to accept the content.

ICE will encompass Leonardo 'rich content' XML in their existing feeds to ICE channels. Leonardo will include in their feed to ICE basic property data (name, address, phone, etc). The Leonardo WebGallery may be embedded in to the ICE DB IFRAME if required by the channel, however the 'powered by Leonardo' strap line must be maintained at all times and vice versa for ICE product distributed by Leonardo.

Integration of the two databases (web services):
- ICE to Leonardo (delivery of 'rich content' URL's for delivery to Leonardo channels)
- Leonardo to ICE (delivery of 'rich content' URL's for delivery to ICE channels).

Either party requires the ability to establish a direct feed to a channel should it procure a direct contractual relationship

**5.1 Responsibilities – Phase 1 to be completed by December 31, 2007**

1. ICE will supply the required XML to Leonardo in a defined Leonardo format on a weekly basis via an agreed mechanism.

2. ICE Portal will provide the feed to Leonardo with a SmartLink to generic digital brochure (DB). The SmartLinks will include Leonardo's codes that will map to corresponding brochure ID. Channels wanting specific branded digital brochures will get SmartLink with specified DID (Distributor ID) to custom design / branding. SmartLink will enable an embedded link and/or image to launch a pop up window (with DB) – if content no longer exists or is unpublished the SmartLink disables or hides the link and/or image that launch DB.

3. Content from ICE may need to be formatted or specifically framed for each channel and this is the responsibility and cost of each channel.

4. Both parties will be responsible for hosting and serving their own content and complying to SLA for channels.

5. If a hotel requires an ICE Webshow, 360 or video – all content will be loaded in to ICE by the hotel.

6. If a hotel requires a Leonardo WebGallery – all content will be loaded in to Leonardo, by the hotel.

7. ICE will be responsible for providing traffic reports – by channel – to reconcile revenues with Leonardo. Reporting will be required on a monthly basis to be provided no later than the 15th day of the following month.

**6.0 Technical Requirements – Phase 2 to be completed by March 31, 2008.**

Both parties agree to develop the capability for Leonardo Tier-1 hotels to manage their static images in Leonardo and for these images to distribute to ICE for population in the ICE integrated webshow/digital brochure (excluding eBooks or any still image only based product including animated flash tours that use still images.). ICE will only integrate static images into the ICE webshow/digital brochure and will not distribute individual static images provided from Leonardo to any channel.

**7.0 Financial Billing & Payment**

Sales responsibilities and targets will be will be mutually agreed between both parties. Upon closing of any sale, both parties will mutually agree the most appropriate course of action to invoice and collect for payment of their respective products.

**8.0 Sales**

Leonardo will position ICE to all relevant Leonardo hotel customers interested in custom rich content production, hosting, management & distribution (brand.com, ICE channels and Leonardo channels). Net rates as per Schedule A.

ICE and Leonardo will promote to channels the partners 'rich content' to gain agreement for delivery of joint content.

Agreed upon strategies of how to gain adoption by channels of the 'joint rich content' delivery as quickly as possible and identify channels where agreement to start 'joint' delivery is not required.

Net rates for sales of partner products, are outlined in Schedule A.

ICE will provide sales 'leads' for any other Leonardo services; (hotels) upgrade DAM modules, e-books, DistributionBank, OMC and (channels) ChannelBank. Leonardo will pay a commission to ICE for any 'sales leads' that materialize in to orders. Refer to Schedule A.

Both parties to define the target hotel groups & new channels not identified in this document no later than November 15, 2007.

**9.0 Marketing**

Agreement to a jointly developed marketing strategy to maximize market penetration of all three phases of the partnership.  Marketing efforts will include a well-rounded and multi-pronged strategy that includes press releases; presence at relevant industry trade shows, affinity programs for re-sellers, joint PowerPoint presentation and refinement of the existing joint website.

**10.0 Partnership Commitments**

1. Update the promotion of the partner alliance on their respective websites
2. Further develop the existing joint website to fully maximise opportunity for sales
3. Independently & jointly introduce the additional services to new & existing clients
4. Jointly develop a strategy for working with hotel management companies and owner groups to deliver a complete solution
5. Commit to participating in joint sales calls, meetings and industry trade shows.
6. Jointly develop marketing & pricing strategies for packaging services to meet market demands.
7. Provide monthly sales reports and revenue share (format to be agreed).
8. Have mutually agreed upon "get-out" clauses in case of sale, merger or conflicts
9. Work with IT staff to develop solutions for achieving the goals, in a timely manner.

10. Jointly determine the best approach for future development of the Agreement

**11.0 Revenue Share**

Each company will market and sell each other's services, with profit sharing opportunities (net rates listed below Schedule A), and help expand the entire network of supply and demand partners. Reconciliation of the shared revenue will be done quarterly in arrears and will be based on received revenues.

N.B. In cases whereby Leonardo is able to contract a channel to pay on a transactional basis for rich content, Leonardo will pay to ICE 50% of the revenue generated from the transactions of the specific ICE digital brochures.

**12.0 Term:**

The Agreement shall be in place for a minimum tenure of one year and will be reviewed no less than 90 day prior to expiration date. With mutual agreement there will be the option to renew for concurrent periods of one year.

**IN WITNESS WHEREOF, the Parties have executed and made effective this Agreement on the date first written below.**

| Partner: Leonardo | ICE Portal, Inc. |
|---|---|
| By: | By: |
| Name: David Elton | Name: Henry Woodman |
| Title: CEO | Title: President |
| Date: 10 – 31 – 07. | Date: 10-26-07 |

**Schedule A**

**ICE Portal 2007 Rates & Net Rates**

**I.  A La Carte Content Production Fees \***

| | | |
|---|---|---|
| **Deluxe Package (10 images)** | **$ 2,000** | |
| • Production + Post Production (PhotoShop) enhancement of 10 images (360 Tours/Photos) | | |
| • Additional images billed at $150 each | | |
| • Re-shoot any existing client (10 new VTs – *after 1 year*) $1,000 | | |
| **Ultra-Res Full Screen Virtual Tours** | **Add $ 250 each** | |

| | | |
|---|---|---|
| a)   Video | **$  6,950** | |
| • 1-2" Video (produced, edited & compressed with voice over & music) | | |

\* *There may be travel expenses, and property will be responsible for local transportation, lodging and meals.*

**II.  Digital Brochure Packages – Client Provides Content** *(or add production fee above)*

| | | |
|---|---|---|
| **Virtual Reality**<br>10 virtual tour - 360° images (provided by client) | $<br>1,995 | **$1,250** |
| **Web Show**<br>Post production of 8-10 Photos (provided by client) in 1 min. Video Montage with Music<br>***Optional -*** Scripting and Voice Over for WebShow  (add)<br>$1,500 | $<br>2,250 | **$1,750** |
| **Video**<br>1-2" Video (provided by client)  ICE will compress into 6 files for streaming<br>Optional – ICE Portal may edit existing material – call for quote. | $<br>2,950 | **$2,250** |

*Includes all post production, set up fees, management, hosting and distribution for year one. At the end of year one client has the option to continue with service and only pays distribution fee below.*

> **In addition to the Rich Content component, digital brochures include the following:**
> 10 Traditional Photos (provided by client)
> Info Sections – Sales Copy, Maps, PDFs, etc. (provided by client)
> Build Customized Digital Brochure & Distribution for first year Included

**III.  Distribution Fees (starting in year two)**

| | | | | |
|---|---|---|---|---|
| **Virtual Tours & WebShows** | $ | 1,195 | $ | 950 |
| **Videos** | $ | 1,995 | $ | 1,450 |

*Distribution fees include all content hosting, management, maintenance, distribution and reports.*

N.B. Leonardo would market and sell the services, performed by ICE Portal, for any price above their net rate, and the difference is Leonardo's profit.

**Schedule B**

**Leonardo's Services & Rates**

**Leonardo products / services**

Any sales leads for Leonardo products and services should be handed to Jeff Thomas VP Americas to propose and close.  To qualify for any commission payment subsequently all sales leads should be fully quantified by ICE and information relating to existing supplier, budget period, decision maker, approval process, timelines etc should be in writing with the prime contact details included plus the appropriate introductory calls made and participated in.

Any sales leads from ICE resulting in a firm sale will result in a 10% commission on annual fees for the initial year of the Agreement. There is no revenue share or commission on net set-up or one-time fees.

**Leonardo 2007 Annual Fees**

**DistributionBank: (below fees do not include implementation fee of $5,000 - $50,000, based on size of group)**
- 1 - 100 hotels: $ 50 per hotel
- 101 - 1000 hotels: $ 35 per hotel
- 1000+ hotels: $15 per hotel
- For average 6 images per hotel

**Digital Asset Management:  (in addition to DistributionBank pricing outlined above)**
- Annual maintenance, product upgrades & account management support: $7,500
- Annual Seamless Connectivity:  $3,500
- Annual Enhanced Reporting:  $1,500
- Annual Customization of User Type:  $2,500
- Annual Support of Group Hotel Codes:  $2,500
- Annual Property Update WebService Interface : $2,500
- Annual Images Update Webserice Interface - $3,500
- Annual Batch upload:  $2,500
- Annual Enhanced File Types: $2,500
- Annual Branded GUI:  $2,500
- Annual Brand Assets Capabilities:  $2,500
- Annual Content Processor:  $4,000

**Private Digital Library:**
- Front-end development:  $5,000

**ChannelBank:**
- Annual Distribution Fee:  $30,000  (for access to complete Leonardo database)

| Number of Hits (as defined below) | Fee per single hit (unique request) USD$ |
|---|---|
| 0 - 60 million | Included |
| 60 - 65 million | 0.010 |
| 65 - 70 million | 0.008 |
| 70 - 75 million | 0.005 |
| 75 million + | 0.005 |

**Schedule C**

### Rich Content Distribution Fees

It is recognized that ICE Portal has an established rich content hotel customer base of approximately 1,600 hotels. (as of September 1, 2007). It is also recognized that Leonardo will be developing a hotel customer base on the WebGallery product. Both parties agree to distribute an initial number of hotels, as defined below, before any annual fees be charged for distribution.

- Leonardo agrees to include and distribute links to ICE rich content to Leonardo channels at no charge fee for the initial 2,500 hotels. After the initial 2,500 hotels, ICE agrees to pay an annual fee of $50 per hotel.

- ICE agreed to include and distribute Leonardo WebGalleries to ICE channels at no charge for the initial 750 hotels. After the initial 750 hotels, Leonardo agrees to pay to ICE an annual fee of $50 per hotel.

# EXHIBIT B

## Addendum to Partnership Agreement

### IHG Virtual Tour Distribution

#### Overview

To provide Leonardo and its client, IHG, synchronized distribution of virtual tour content to the GDS, Pegasus and other online travel channels. ICE Portal is serving as a sub-contractor to Leonardo in satisfying the rich media distribution needs of IHG, as it specifically relates to the distribution of 360 Virtual Tours.

#### Details of Work

Breakdown of the high-level functionality and requirements for virtual tour distribution:

- Global synchronized distribution of virtual tours to ICE Portal's distribution network (Attached and described as "Notable Distribution Network" - Appendix B).
- Creation and customization of a digital brochure with a corresponding applet that enables viewing of the virtual tours on the TPIs.
- Creation of an Expedia Hotel Diagram for each Expedia Special Rate property, as requested and approved by Expedia.
- Integrated management tool – providing seamless access through current IHG DAM to manage digital brochure images, features, settings, etc.
- Comprehensive reporting package including:
    - o Total Unique Visitors
    - o Top 10 Brochures by Unique Visitors
    - o Unique Visitors by Specific Brochure
    - o Top 10 Brochures by Total Views
    - o Total Visitors & Views for all Properties
    - o Total Views for Specific Brochure
    - o Top 10 Most Active Distributors by Brochure Views
    - o Brochure Views by Specific Distributor
    - o Top 10 Brochures by Number of Clicks to Rates & Reservations tab
    - o Total Views by Language for all Brochures
    - o Total Views by Language for Specified Brochure
    - o **Note:** Reporting functionality is not available for TPI's who host the virtual tours within their own DAM (Digital Asset Management) platform, including Expedia (and their network of affiliated sites) and effective November 1, 2008, Travelocity (and their network of affiliated sites).
- Daily synchronization with Leonardo for IHG's virtual tour and still image assets that are to be included in the digital brochure for distribution.
- Integration of a Flash player within 60 days of IHG's execution of the order form and a communication to the OTA's making them aware of the new player option
- Meeting and/or exceeding Service Level Agreements in place with ICE Portal and their providers.  Current SLA agreements can be found in Appendix A.

#### Schedule/Contractual Terms

- This Agreement will be effective as of October 1, 2008 and will run for a term of one (1) calendar year from then ("Initial Period"). The agreement may then be renewed in parallel with our partnership agreement by mutual agreement for successive periods of

one year each.  Intent by either party to cancel this Agreement must be provided to the other party in writing no less than ninety (90) days prior to the expiration date.
- In the event that Leonardo should undergo a change of ownership control, this agreement shall survive for a minimum of the Initial Period.
- This agreement is for the provision of distribution services only from ICE Portal to Leonardo for the purposes of distribution of virtual tours for Leonardo's client, IHG.
- This agreement recognizes that ICE does not have any direct relationship with IHG for the provision of this service and that IHG's relationship is owned by Leonardo
- At no time will ICE Portal solicit similar services to/from IHG on a direct basis

## Fees

- ICE Portal will provide Leonardo the above outlines services for a net rate of $150 per property per year
- Fees to be on a pro rata basis – in line with IHG terms regarding this.
- Leonardo has the right to additionally mark-up the established net rate when selling to their customer
- No VAT is chargeable on these services (as Dutch BV Leonardo is not required to charge VAT).

## Payment Terms

- Leonardo will issue an annual maintenance fee to IHG each April, based on the number of active properties distributing virtual tours.
- Properties implemented before/after the renewal date will be invoiced a pro-rated amount.
- If any IHG hotel cancels their contract mid term, then the ICE charges will be pro rata accordingly.
- Leonardo will be responsible for paying ICE Portal within 30 days of payment receipt from IHG.
- Payment will be made to ICE Portal by Wire transfer according to the following instructions:
    o Funds will be wired in US Dollars to:
      Bank Atlantic 1 (800) 741-1700
      1771 N.W. 40th Avenue
      Lauderhill, FL  33313
      ABA #267083763
      ICE Portal Account #0059578490
      SWIFT:  BKATUS3F

## Additional Terms & Conditions:

- IHG has requested the following phased implementation.
    o Phase 1:
        ▪ Includes an initial batch of 355 properties (all brands except HI, EX, and SS). This will include making the content available to all distribution partners within ICE Portal's distribution network by October 15, 2008 and a rolling distribution schedule to Expedia be completed by December 1, 2008.

- Invoicing will be prorated to IHG's annual renewal date (April 2009) and split into two payments – 50% upon signing of the agreement and 50% upon distribution of phase 1 properties.
  - o Phase 2:
    - Includes the distribution of the remaining 700+ properties consisting of HI, EX and SS. These properties will be distributed using the same plan as Phase 1. Expedia will have a rolling distribution of four months.
  - o Phase 3:
    - Includes properties above and beyond the initial 1,100 as and when virtual tours are uploaded and activated for distribution

- Service Level Agreements
  - o ICE Portal agrees to meet the service levels outlined in Appendix A
  - o These service levels have been defined by ICE Portal and have been approved by Leonardo and its client, IHG.

**In witness whereof**, the Parties mutually agree and have executed this Amendment to the Strategic Partnership Agreement,

| Leonardo Media Services BV. | ICE Portal, Inc. |
|---|---|
| Name: DAVID ELTON | Name: HENRY WOODMAN |
| Function: CEO | Function: PRESIDENT |
| Date: 1/10/08 | Date: OCT. 1, 2008 |

# EXHIBIT C



**DAVIES WARD PHILLIPS & VINEBERG LLP**

44th Floor      Tel 416 863 0900
1 First Canadian Place      Fax 416 863 0871
Toronto Canada M5X 1B1      www.dwpv.com

December 23, 2008

Patrick E. Moyer
Dir 416.367.6967
pmoyer@dwpv.com

File No. 206281

## WITHOUT PREJUDICE

## BY E-MAIL AND COURIER

ICE Portal, Inc.
3595 Sheridan St.
Suite 200
Hollywood, FL 33021
United States

**Attention:  Henry Woodman**

Dear Sirs:

**Breach of Agreement with VFM Leonardo Inc.**

We are counsel to VFM Leonardo Inc. ("VFM").  We are writing on behalf of VFM in response to your e-mail dated December 5, 2008 seeking payment of US$40,187.50 (plus $832.38 in interest) you claim is owing under an October 2008 addendum to the strategic partnership agreement dated October 2007 (the "Agreement") between Leonardo Media Services B.V. and ICE Portal, Inc. ("ICE").  As you are aware, the Agreement was assigned to VFM on November 4, 2008 in connection with VFM's acquisition of the business of Leonardo Media B.V.

VFM disputes your claim.  VFM has learned that ICE has violated the non-solicitation provisions of the Agreement relating to Intercontinental Hotels Group ("IHG").  The Agreement states that it "recognizes that ICE does not have any direct relationship with IHG for the provision of [rich media distribution services] and that IHG's relationship is owned by [now VFM]".  Recognizing this, the Agreement provides that "[a]t no time will ICE Portal solicit similar services to/from IHG on a direct basis".  VFM has learned that following November 4, 2008, in clear violation of this covenant, ICE was in direct contact and negotiation with IHG, and offered to enter into an agreement to provide IHG's Six Continents Hotels with rich media production and distribution services (as part of the IC Meetings Project).

The non-solicitation provision that you have breached is fundamental to, and constitutes a repudiation of, the Agreement, and VFM therefore has determined to regard the Agreement as rescinded.  Should you pursue your claim, VFM will vigorously dispute it and reserves

Page 2                                      DAVIES WARD PHILLIPS & VINEBERG LLP

the right to seek substantial damages for your breach of the non-solicitation provision of the Agreement.

This letter is also notice to you that VFM is terminating the Agreement effective immediately (in case it should be judicially determined not to be void). The original agreement between Leonardo Media and IHG relating to the distribution of virtual materials has also been cancelled as of the date hereof. You should immediately cease all services under the Agreement, including any distribution of virtual tours for IHG properties.

The Agreement provides that, if any IHG property cancels its contract during the term of the Agreement, the amounts payable to ICE will adjusted pro rata. Notwithstanding your breach of the non-solicitation provision and the damages suffered by VFM as a result thereof, in the hope of avoiding possibly expensive and time-consuming litigation, VFM is prepared to offer to settle your claim for amounts purported to be owing under the Agreement on this basis, as set out in further detail herein.

Specifically, $24,406.25 was previously paid to you in connection with your September 1, 2008 invoice in respect of the distribution of virtual tours for 355 "Phase I" hotels for the period commencing September 16, 2008 and ending March 31, 2009. This represents $124.52 for each day in this seven month period. Your December 2008 invoice is for $40,187.50 in respect of the distribution of 644 "Phase II" hotels' virtual tours from November 1 to March 31, 2009, representing $266.14 for each day in this five month period. Accordingly, the total fee, pro rata to the date hereof, would be $26,042.78, being the sum of (i) $124.52 multiplied by the number of days from September 1, 2008 to December 23, 2008 (98) and (ii) $266.14 multiplied by the number of days from November 1, 2008 to December 23, 2008 (52). $24,406.25 was previously paid to you, so the net amount remaining to be paid would be $1,636.11. VFM is willing to pay this amount in settlement of all amounts payable to you under or in connection with the Agreement, if you indicate your acceptance of this offer in writing delivered to VFM no later than Monday, January 5, 2008. After that date, this offer shall be null and void.

Yours very truly,

Patrick E. Moyer

Patrick E. Moyer

PEM/rg

Cc      Paolo Boni
        *VFM Leonardo Inc.*

Tor#: 2239245.4

# EXHIBIT D

## SIX CONTINENTS HOTELS, INC. -- ICE PORTAL, INC.

## CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement (the "Agreement") is entered into as of this **<u>18th</u>** day of **<u>November</u>** 2008 ("Effective Date") between **ICE Portal, Inc.** (hereinafter referred to as "ICE"), a Florida corporation, located at 3595 Sheridan Street, Suite 200, Hollywood, Florida 33021, and Six Continents Hotels, Inc. (hereinafter referred to as "SCH"), a Delaware corporation, located at Three Ravinia Drive, Suite 100, Atlanta, Georgia 30346.

### WITNESSETH:

For and in consideration of the mutual promises and benefits contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.  **Scope of Services**.  ICE shall provide to SCH professional services as described on Schedule "A", attached hereto and incorporated herein by reference, and as instructed by SCH, (the "Services"). In the event of a conflict in the terms of Schedule A and this main body of the Agreement, the former shall prevail. Additions and/or revisions to the Services shall be authorized in writing and signed by both SCH and ICE and shall be subject to the terms and conditions set forth in this Agreement.

2.  **Term of Services**.  The Services shall begin as of the Effective Date and continue until terminated in accordance with this Agreement.

3.  **Resources and Personnel**.  ICE represents that it has sufficient resources and has allocated these resources so that the work shall be completed within the time specified in Schedule A or any amendments thereto.  Except as otherwise specifically provided for in Schedule A, delays beyond the control of SCH that result in overtime or other additional expenses will be borne by ICE and SCH will owe no additional amounts. ICE shall assign professional personnel to provide the Services and warrants and agrees as follows:

    3.1  ICE warrants that any and all personnel assigned to perform the Services are trained and qualified to provide the Services.

    3.2  ICE agrees to promptly certify in writing to SCH upon request that each and every worker, individually identified by name, assigned to SCH's premises at any time is a documented citizen of the United States or an alien authorized under all applicable requirements to work in the United States and that the employment eligibility of such alien has been verified by ICE using the Employment Verification Form (I-9). ICE shall also be responsible for complying with the laws of other countries in which they hire freelance consultants.

    3.3  SCH shall have the right to approve or reject any and all personnel ICE proposes to assign to perform the Services.

    3.4  SCH shall have the right to determine, in its sole judgment, whether the Services and/or any and all personnel assigned to perform the Services meet standards of quality, performance and skill reasonably to be expected considering price and industry standards.

    3.5  SCH does not retain, and will not exercise, the right to direct, control, or supervise assigned personnel as to the details and means by which the Services contracted for are accomplished.

    3.6  In the event the Services or any personnel provided by ICE do not meet those standards described in this section or in the event any personnel provided by ICE fail to adhere to SCH's directions, SCH may notify ICE of SCH's dissatisfaction and ICE shall address the situation.

    3.7  ICE shall use its best efforts to replace ICE personnel unable to continue performing services because of illness, resignation, or other causes beyond the reasonable control of ICE.  In the event ICE personnel are unable to perform and such personnel cannot be replaced, SCH may terminate this Agreement effective as of the date of the cessation of Services by said personnel and shall thereafter have no further obligation for payment under this Agreement.

4.    **Rates**.  Rates for the Services shall be as provided in Schedule A.

5.    **Taxes**.  In the event foreign, federal, state or local taxes are assessed on the Services, SCH shall reimburse ICE for such taxes (except for taxes based on the income of ICE, ICE employees or personnel provided by ICE pursuant to this Agreement, or franchise taxes).  SCH shall have no obligation to reimburse ICE for such taxes unless ICE gives SCH timely notice of the imposition of such taxes and in the event SCH contests such imposition, cooperates with SCH in contesting such imposition.

6.    **Project Related Expenses**.  ICE shall be reimbursed at actual cost (without commission or markup) for all necessary and reasonable out-of-pocket travel expenses incurred by ICE personnel.  ICE agrees that air travel shall be coach class at the lowest available published fare and that the Participating Hotel shall provide accommodations and other related expenses as provided for in Schedule A..  The expenses must be approved by SCH in advance..

7.    **Insurance**.

    7.1    ICE, and at ICE 's own cost and expense, shall obtain and maintain, in full force and effect during this Agreement, the following insurance:

        7.1.1    Worker's Compensation Insurance with statutory limits of coverage;

        7.1.2    Employer's liability insurance with a minimum limit of $2,000,000 for each occurrence.

        7.1.3    Commercial general liability insurance (with independent contractor's coverage and coverage for operations, liability assumed under contract, libel, slander, defamation, false arrest, detention or imprisonment, malicious prosecution, wrongful entry or eviction, invasion of privacy, and any claim for loss of property caused by a dishonest or fraudulent act of an employee of ICE).  The limits shall be not less than $2,000,000 for personal and bodily injury per occurrence, and $500,000 for property damage.

        7.1.4    Advertising liability insurance with limits of not less than $2,000,000.

        7.1.5    Comprehensive automobile liability insurance covering the use and maintenance of owned, not-owned, hired and rented vehicles with limits of not less than $1,000,000 for personal and bodily injury per occurrence, and $100,000 for property damage. In the alternative, ICE employees shall be covered by ICE Company VISA's limits.

        7.1.6    Commercial blanket bond coverage to insure against fraudulent or dishonest acts of ICE's employees in the principal amount of $100,000.

        7.1.7    Professional liability insurance, including contractual liability coverage, having a minimum limit in the aggregate of $1,000,000 for each claim, and an aggregate limit of $2,000,000 for all claims arising out of services performed under this Agreement.

    7.2    SCH, its subsidiaries, parents, licensees, and affiliates shall be named as additional insureds on the ICE's policy or policies for coverages (7.1.3) - (7.1.7) above.

    7.3    Insurance Certificates.  The insuring carriers and the form of the insurance policies shall be subject to approval by SCH.  ICE shall forward to the Risk Management Department of SCH at Three Ravinia Drive, Suite 100, Atlanta, Georgia 30346, certificates of such insurance issued by the insuring carrier or carriers, as to the term and coverage of the insurance in force, the persons insured, and the fact that the coverage may not be canceled, altered, or permitted to lapse or expire without 30 days' advance written notice to SCH.  The fulfillment of these insurance obligations shall not relieve ICE of any liability assumed by ICE in this Agreement or in any way modify ICE's contractual or common law obligations to indemnify SCH.

8.    (a) **ICE Indemnity**.  ICE shall indemnify and hold harmless SCH, its parents, divisions, subsidiaries, licensees, and affiliates, and their officers, directors, employees, agents, successors and assigns (collectively, "Indemnified Parties" and each of the foregoing being hereinafter referred to individually as "Indemnified Party"), against, and hold them harmless from, all liability to third parties and promptly reimburse them for all costs and expenses

(including, without limitation, all settlements, judgments, fines, damages, reasonable legal fees, court costs, expert fees, etc.) by reason of any claim, demand, tax, penalty or judicial or administrative proceeding or investigation (even where negligence of the Indemnified Party is also alleged) arising from or in connection with:

8.1   any act, omission or obligation ICE, its parent, subsidiaries, licensees, affiliates, subcontractors, and suppliers and their respective officers, directors, employees, agents or successors or assigns;

8.2   any product or service provided by ICE under this Agreement;

8.3   any failure to perform or breach of this Agreement;

8.4   any injury or death to persons or damage to property, including but not limited to theft, sustained by any person that is a result of the alleged acts or omissions of ICE;

8.5   any and all claims violation by ICE of SCH's and/or ICE's Privacy Policy, misuse by ICE of personally identifiable information, or any breach of any applicable data protection and privacy laws and regulations that is caused by ICE;

8.6   any violation by ICE of any third party's trade secrets, proprietary information, trademarks, copyrights, patent rights, or other intellectual property rights;

8.7   ICE's failure to perform all obligations owed to its employees, including any claim that employees might have or make for privilege, compensation, or benefits under any employee benefit plan; and

8.8   any and all sums due and owing to the Internal Revenue Service (IRS) for withholding, FICA, unemployment, or any other state or federal taxes. ICE further agrees to timely make such withholdings, deposits, and payments to the IRS and appropriate state authorities for all employment related taxes, withholding, FICA, and other taxes.

(b)   SCH shall indemnify and hold harmless ICE, its parents, divisions, subsidiaries, licensees, and affiliates, and their officers, directors, employees, agents, successors and assigns (collectively, "Indemnified Parties" and each of the foregoing being hereinafter referred to individually as "Indemnified Party"), against, and hold them harmless from, all liability to third parties and promptly reimburse them for all costs and expenses (including, without limitation, all settlements, judgments, fines, damages, reasonable legal fees, court costs, expert fees, etc.) by reason of any claim, demand, tax, penalty or judicial or administrative proceeding or investigation arising from or in connection with the negligent acts or omissions of SCH.

At the election of either party, the remaining party will also defend the other party against same.  In any event, both parties shall have the right, through counsel of its choice and at their own expense to conduct or participate in the defense and to control any matter to the extent it could directly or indirectly affect the other party. Both parties shall cooperate with such defense to the fullest extent possible. The offending party shall reimburse the other party for all payments of money (including without limitation, all costs, expenses, fines, damages, legal fees, court costs, settlements, judgments, etc.) incurred by the indemnified party to defend and protect itself from, or to remedy, defaults of the offending party under this Agreement.

Neither party, however, is not required to indemnify the other party for damages caused by or resulting from the sole proven negligence, gross negligence or willful misconduct of the other.

9.   **Limitations of Liability**.

9.1   In no event shall either of the parties hereto be liable to the other for the payment of any consequential damages. The provisions of this Section, however, shall not apply in any way to or limit the Indemnifying Parties obligation to indemnify any Indemnified Party.

9.2   ICE understands that most participating hotels are independently owned by franchisees in SCH's system of hotels and that SCH does not control the day-to-day operations of franchised hotels.  ICE understands and agrees that the sole remedy available against SCH for the acts or omissions of such franchisees shall be notification to the participating hotel that it may no longer participate in the activities contemplated by this Agreement. SCH will facilitate communications with franchised hotels.

9.3   ICE's Property.  SCH does not have and shall not assume any responsibility for the safekeeping of ICE's property stored or used on SCH's premises.

10.     **Warranty**.

    10.1    If applicable and in the event ICE grants SCH a software license hereunder, ICE hereby warrants that it has the right to grant SCH such license and such grant of license does not violate or infringe upon the rights of any other person or entity.

    10.2    ICE warrants that it has the right and power to enter into this Agreement and that the Services will be performed in a professional and workmanlike manner.

    10.3    Disabling Code.  ICE covenants that it shall take all commercially reasonable steps to ensure that no code in any software or equipment being provided to SCH hereunder which could have the effect of disabling or otherwise shutting down such software and/or equipment or operations performed using such shall be permitted to be invoked without the prior consent of SCH.

    10.4    Viruses:  ICE shall use diligent efforts to ensure that no viruses are coded or introduced into the SCH's operating environments by way of any software and/or equipment being provided hereunder.  If a virus is found to have been introduced into the operating environments by way of the software and/or equipment, ICE shall use commercially reasonable efforts and diligently work to eliminate the effects of the virus.  ICE shall bear the costs associated with providing to SCH replacement software or equipment that is virus-free.  SCH shall undertake commercially reasonable measures on its own to protect against potential viruses.

11.     **Ownership of Intellectual Property**.

    11.1    All work product, whether or not copyrightable or patentable, including, but not limited to, software programs and documentation developed for SCH by ICE or utilized solely for SCH while performing and charging SCH for Services, and any and all advertising and marketing materials and the component parts thereof, including without limitation, all ideas, plans, copy, slogans, creative concepts, videos, research, photographs, advertisements, commercials, musical compositions or other materials submitted, created, developed or supplied at the direction of and in collaboration with SCH, including the Content and Interactive Brochure (the "Works") pursuant to this Agreement shall constitute works-made-for-hire, as defined in 17 USC 101, shall be SCH's sole and exclusive property and shall be dealt with by ICE as such. ICE shall sign or cause to be signed such further documents as SCH may from time to time request to evidence this fact.  ICE shall ensure that all Works created for SCH are original and do not infringe or violate the intellectual property rights of anyone else.

    11.2    If for any reason ICE's contribution to the creation of the Works shall be found to be anything other than works-made-for-hire, ICE and each ICE employee hereby assigns, grants and transfers ownership to SCH of the following:  (a) all intellectual property rights in the Works, including without limitation, copyright, trademark, service mark, patent or other rights (collectively "Intellectual Property Rights"); (b) any and all other ownership rights in the Works; and (c) any and all rights in any renewal terms of the Intellectual Property Rights or other ownership rights in the Works.  ICE agrees to (and will ensure that its employees and subcontractors shall) take all action necessary to evidence SCH's ownership, to protect all rights and to effect all renewals described herein, including without limitation, executing and filing all applications, assignments, renewals and/or other documents necessary or advisable to further vest all right and interest in the Works to SCH or to secure any Intellectual Property Rights.

    11.3    SCH has the right to make and distribute multiple copies, to grant licenses for use by third parties, and/or to make, use, buy or sell any product or service derived from the Services performed under this Agreement, to any third party.

    11.4    Software, documentation, or other materials developed by ICE prior to this Agreement, or developed by ICE outside of this Agreement, and used by ICE to fulfill its obligations under this Agreement, and so identified to SCH in writing and in advance of its use, will remain the exclusive property of ICE.

12.     **Confidentiality**.    In addition to, and not in lieu of, any Confidentiality Agreement the parties may have executed, each party agrees to keep confidential all data and other information that is designated as confidential.  Information that is designated as confidential includes, without limitation, the following:  (a) any technical information, design, process, procedure, formula, improvement, and other data relating to the Services provided specifically for SCH or by SCH; (b) business plans and financial information of ICE or SCH; and (c) other information of ICE or SCH information identified as such to the other (hereinafter, "Confidential Information").

Each party agrees that for a period of three (3) years from termination of this Agreement, it will hold such Confidential Information in strict confidence and will not discuss with or disclose it to any third party or use it for any third party's benefit or for any purpose other than as contemplated by this Agreement, or as separately agreed in writing.  The parties acknowledge that the following shall not be considered Confidential Information: (i) information which at the time of disclosure is, or without fault of the recipient becomes, available to the public by publication or otherwise; (ii) information which either party can show was in its possession at the time of disclosure or was independently developed by it without any reference to the other party's information and was not acquired, directly or indirectly, from the other; (iii) information received from a third party which had the right to transmit same without violation of any secrecy agreement with the other party;  (iv) information which is required to be disclosed pursuant to court order or by law or regulation; provided, however, that in the event disclosure is required by law, regulation or court order, the receiving party will (a) notify the disclosing party of the obligation to make such disclosure promptly and sufficiently in advance of the time required to disclose to allow the disclosing party the opportunity to seek a protective order, (b) shall cooperate with the disclosing party in seeking the protective order, and (c) shall make disclosure only to the narrowest extent required to comply with the law, regulation or court order.  For information that meets the applicable definition of a trade secret (as defined in the Business Services Confidentiality Agreement executed by ICE and SCH) and retains trade secret status under applicable law, this obligation shall survive the termination of this Agreement.

13.  **Invoices, Payments and Limitation of Charges**.

    13.1    Invoices and Payments. Except as otherwise may be specifically provided for in Schedule A of this Agreement, for all of the Services, fees, expense amounts and reimbursement described in this Agreement, ICE shall prepare and submit invoices to SCH monthly.  Said invoices shall be accompanied by a detailed description of the Services performed and other supporting documents as SCH may require.  SCH will pay to ICE the undisputed invoice amounts within thirty (30) days after receipt.  Said payment shall be subject to adjustment for amounts found to have been improperly invoiced.  Payment of all or a portion of any invoice by SCH shall not constitute acceptance by SCH of the Services or the results of the Services. Notwithstanding anything to the contrary contained herein, invoices are to be sent directly to the Participating Hotel for the Services outlined in Schedule A, and the Participating Hotels shall be solely liable for such rates and fees as set forth therein.

    13.2    Limitation of Charges. SCH shall not be obligated to pay ICE for charges incurred in excess of the total previously authorized by SCH, unless and until approved in writing by authorized representatives of both parties.

14.  **Completion of the Services**.  Except as otherwise may be specifically provided for in Schedule A of this Agreement, ICE shall provide written notification to SCH of the completion of the Services.  SCH shall have thirty (30) days from the date of receipt of such notice of completion to provide to ICE written notification of acceptance or rejection of the completion of the Services. ICE shall promptly correct at its cost and expense any and all deficiencies in the Services identified by SCH.

15.  **Termination and Expiration of Agreement**.

    15.1    Termination for Cause.  Either party may terminate this Agreement if the other party fails to comply with any material provision of this Agreement. In order to terminate this Agreement, the terminating party must give the other party written notice of the breach and ten (10) business days to cure such breach.  If the other party fails to cure the breach within thirty (30)  days or the breach cannot be cured, this Agreement shall be deemed terminated on the eleventh (31st) business day after the notice of breach has been given.

    15.2    Termination without Cause. Either party may terminate this Agreement without cause on sixty (60) days' prior written notice to the other party. ICE shall, on or before the date of termination, turn over to SCH all Works and Works in process generated pursuant to this Agreement.

    15.3    Insolvency.  Either party may terminate this Agreement by notice in writing effective upon mailing, in the event the other party is insolvent, makes an assignment for the benefit of creditors, is unable to pay debts as they mature, files or has filed against it a petition in any court setting forth or alleging any of the foregoing, or has a trustee, receiver, or officer of the court appointed to control or supervise all or any substantial part of its assets or businesses.

15.4    Upon termination of this Agreement, ICE shall reasonably cooperate with SCH in the transition of those services provided by ICE and shall ensure that all Interactive Digital Brochures, videos and other work product have been delivered to SCH.  SCH, where applicable, shall pay for Services already rendered and for reimbursement of the reasonable costs associated with any requested transition.

15.5    Upon termination or expiration of this Agreement, all Works, software programs, documentation, and materials belonging to either party shall be returned to the respective owner thereof by the non-owning party unless the respective owner consents thereto in writing. Termination or expiration of this Agreement shall not extinguish the rights or obligations of the parties hereunder with respect to, without limitation, indemnification, ownership and disposition of intellectual property and data, confidentiality, and audit.

16.     **Independent Contractor**.  In performing the Services under this Agreement, ICE is doing so as an independent contractor.  This Agreement does not constitute and shall not be construed as constituting a partnership or joint venture between ICE and SCH.  Neither party shall have the right to obligate or bind the other party in any manner whatsoever.  Nothing herein contained shall give, or is intended to give, any rights of any kind to any third persons. All persons employed by ICE in the performance of services hereunder shall be under the sole and exclusive direction and control of ICE and shall not be considered the employees of SCH for any reason. At no time shall either party make any commitments or incur any charges or expenses for or in the name of the other party, or be considered the agent, partner, joint venturer, employer or employee of the other party, and in no event shall performing Services under this Agreement give ICE or any employee of ICE, or any personnel provided by ICE hereunder, any right in or claim to any employee benefits of SCH.

17.     **Inspection**.  All Services shall be subject to inspection by SCH at any reasonable time and place, including the period of design or processing.  Any inspection by SCH shall be performed in such a manner so as not to unduly delay the work.

18.     **Notices**.  Any notices of default and/or termination provided for in this Agreement shall be given in writing and transmitted by personal delivery, overnight courier delivery, or prepaid registered or certified mail addressed, with proof of receipt. Notices shall be sent to:

ICE:        ICE Portal, Inc.
            3595 Sheridan Street, Suite 200
            Hollywood, FL 33021
            Attention: Henry Woodman, President

SCH:        Six Continents Hotels, Inc.
            Three Ravinia Drive, Suite 100
            Atlanta, GA  30346-2121
            Attention:   Global Distribution Marketing Attorney

            Copy by fax to Legal Department – 770-604-2212

Delivery shall be deemed given as of the date the receipt is signed. All other notices, demands or communications may be sent by regular mail, postage prepaid, or by facsimile or e-mail (with evidence of the e-mail having been opened). If the notice, demand or other communication is sent by regular mail, it shall be deemed given four (4) days *[ten (10) days for international mail]* after it is postmarked.  If sent by overnight courier or facsimile, it shall be deemed given the next business day following its transmission.  If delivered in person, it shall be deemed given on the date of delivery.

19.     **Sub-contracts and Assignments**.  Except as otherwise may be specifically provided for in Schedule A of this Agreement, no sub-contract or assignment shall be made by ICE for the furnishing of any work under this Agreement without the prior written consent of SCH.  ICE may not assign any of its rights or obligations under this Agreement without the prior written consent of SCH.

20.     **Exclusivity**.  SCH may engage companies and/or individuals other than ICE to provide similar services.  ICE does not have an exclusive right to provide the Services to SCH.

21.     **Use of Intellectual Property**. ICE agrees that, except as may be required by applicable law or regulation, it shall not use in advertising, publicity or otherwise, any information concerning this Agreement, the trademarks, service marks, trade names or company names of SCH, or disclose the terms and conditions of this Agreement without the prior written consent of SCH. ICE acquires no rights in any intellectual property, including without limitation, any trademarks, service marks or copyrights of SCH, its subsidiaries or affiliates. All usage shall inure to the benefit of SCH.

22.     **Compliance with Laws and Access Related Rules and Policies**. ICE will comply with all applicable federal, state and local employment and other laws, government regulations and orders. , ICE will not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin, age or any other unlawful criterion, and it shall comply with all applicable laws against discrimination and all applicable rules, regulations and orders issued thereunder or in implementation thereof. The Equal Opportunity Clauses set forth in 41 C.F. 60-1.4(a), 60-250.5(a) and 60-741.5(a) are incorporated by reference herein.

If the Services involve access to a SCH facility and/or information system, ICE shall comply, and shall ensure that its employees and contractors comply, with all rules and policies concerning access to and use of such facility and/or information system as may be provided by SCH., in accordance with the attached Systems Access Agreement.

23.     **Audit**. ICE shall keep, maintain and preserve at its principal place of business for at least two (2) years following termination or expiration of the term of this Agreement or any renewal(s) hereof, complete and accurate records of accounts related to services under this Agreement. Such records and accounts shall be available for inspection and audit at any time or times during or after the term of this Agreement or any renewal(s) hereof during reasonable hours upon notice by SCH or its designees. ICE agrees to cooperate with SCH or designees of SCH in the performance of its duties of inspection and audit.

The exercise of the right by SCH to audit records and accounts or the acceptance by SCH of any statements, credits or refunds shall be without prejudice to any rights or remedies of SCH and shall not prevent SCH from thereafter disputing the accuracy of any such statements, credits or refunds.

24.     **Data Ownership, Collection and Access**. SCH owns all personally identifiable information related to current and prospective InterContinental Hotels Group hotel guests and Priority Club Rewards members and prospective guests and members ("Customers"), as well as any information related to employees of SCH, its parents, subsidiaries, affiliates and assigns ("SCH Employees"), that may collected by ICE its agents, subcontractors, employees and contractual parties in the performance of this Agreement, or as otherwise acquired by ICE ("Personal Data").

If Personal Data is disclosed to ICE to perform a specific task under this Agreement then ICE will use the data only to perform such task. ICE shall ensure that the data is not used for any other purpose not specifically requested in writing by SCH. ICE shall ensure that Personal Data is safely secured. If this Agreement requires ICE to carry out the processing of Personal Data and to transfer the data to another country, ICE warrants that ICE has or shall obtain the necessary legal authority to do so.

If Personal Data is disclosed to ICE to perform a specific task under this Agreement then, ICE shall co-operate with SCH in complying with the exercise by SCH, a Customer, or SCH Employee of rights with regard to Personal Data processed by ICE under this Agreement and with any actions of data protection authorities. ICE shall identify to SCH an individual within its organization to act as point of contact for any inquiries from SCH or data protection authorities relating to Personal Data. ICE shall cause the Personal Data disclosed to ICE to be removed from all records after the specific task to which it relates under this Agreement has been performed or to be corrected or removed upon request.

ICE shall not use, sell, loan, rent, barter, transfer to, or otherwise enter into any transaction with, any third party, regarding any Personal Data derived from the use, purchase, or viewing of any goods or services offered or provided by way of this Agreement ("Customer"), except as such Customer and SCH may affirmatively agree in advance.

25.     **Privacy Policy** (applicable if ICE deals with personal information).

If this Agreement requires or permits ICE to deal with personally identifiable information, ICE shall comply with SCH's privacy policies found at www.ichotelsgroup.com and shall publish its own Privacy Policy (or provide a reference to where such Policy may be easily reviewed) and ICE's web site(s) shall contain hypertext links to ICE's Policy.

Where applicable, ICE's Policy shall govern the use of personally identifiable information and shall comply with all applicable data protection and privacy laws and regulations. ICE shall strictly comply with the terms of its Privacy Policy and shall be solely liable for any violations of it.

26.     **Software Escrow** (applicable if ICE is providing Software).

26.1     Escrow Agent.  If ICE is providing Software under this Agreement, within 90 days of the signing of this agreement, ICE shall deposit a copy of the latest Software source code, and all related documentation, with DSI, Inc. or an alternate Escrow Agent (the "Escrow Agent") and enter into an escrow agreement that reflects the provisions of this section. The deposited materials ("Materials") shall be sufficient to permit SCH to modify, update, upgrade and otherwise support the Software.  ICE will update the Materials deposit every 180 days throughout this agreement, and provide a written certification of same to SCH.  The parties will share equally in the costs of this escrow agreement.

26.2     Release of Escrow Materials.  Such escrow materials shall be delivered to SCH upon the occurrence of either of the following circumstances during the term of this Agreement (the "Triggering Event"):

26.2.1     an entry of an order for relief under Title 7 of the United States Code, and such petition is uncorrected for more than 60 days;

26.2.2     an entry of an order for relief under Title 11 of the United States Code and the appointed trustee of ICE's bankruptcy estate elects to reject this Agreement; or

26.2.3     ICE fails or refuses to provide continued support of the Software as reasonably required by this agreement, which failure or refusal continues for ninety (90) days following written notice thereof.

26.3     SCH's Option.  Upon the occurrence of a Triggering Event, SCH shall have the right, but not the obligation, to issue notice to the escrow agent to release the Escrow Materials to SCH, at which time the Escrow Agent shall notify ICE of SCH's notice.

26.4     Delivery of Escrow Materials. SCH is hereby granted (effective upon the occurrence of a Triggering Event) a right to use the Escrow Materials, subject to all of the limitations on use, access, or disclosure by SCH that are applicable under the terms of this Agreement.

27.     **Business Continuity and Data Security** (applicable if this Agreement requires or permits ICE to have access to Customers' or SCH Employees' credit card information).

27.1     ICE warrants that it, or its vendor, Data Pipe,  maintains a disaster recovery plan (the "SCM Disaster Recovery Plan") which is at least commercially reasonable within the industry in which the Services are being provided. ICE agrees to follow its ICE Disaster Recovery Plan. ICE may modify its ICE Disaster Recovery Plan at any time in ICE's reasonable discretion, provided that ICE may not in any such modifications materially diminish the level of disaster recovery ability provided below that level of disaster recovery ability which is provided as of the Effective Date of this Agreement, and provided further, that any such modifications made by ICE must be commercially reasonable. ICE will provide a copy of the current summary of the ICE Disaster Recovery Plan upon SCH's request. ICE will perform testing of ICE's Disaster Recovery Plan at least once every 18 months, and ICE will provide a copy of the summary test results to SCH upon SCH's request, within a commercially reasonable period of time following such request. ICE will address, in a commercially reasonable manner, any failures in the Disaster Recovery Plan that are identified by such testing.

27.2   ICE agrees to store such credit card data (including Records of Charges and credit forms) only to facilitate credit card transactions.  ICE further agrees to comply with the current Payment Card Industry Data Security Standard.  Such data may, however, be stored and used with the consent of the individual.

28.   **Miscellaneous**.

28.1   Severability.  If any provision of this Agreement or the application of any provision hereof is held invalid, the remainder of this Agreement and the application of such provision shall not be affected unless the provision held invalid shall substantially impair the benefits of the remaining portions of this Agreement.

28.2   Construction.  The parties acknowledge and agree that this Agreement has been drafted and prepared through the efforts of both parties, that legal counsel has been available to both parties, and the rule of construction that any vague or ambiguous terms are to be construed against the party drafting same shall not be applied to either party to this Agreement.

28.3   Captions.  Section headings are for the convenient reference of the parties and do not affect the meaning or interpretation of this Agreement.

28.4   No Waiver.  The failure of either party to enforce, or the delay by either party in enforcing, any of the provisions, rights or remedies hereunder, shall not be a waiver of such provision, rights, or remedies, nor affect the validity of this Agreement, and shall not constitute a continuing waiver or modification of such provision, right, or remedy or a waiver or modification of any other provision, right or remedy hereunder. The exercise by a party of any rights provided by this Agreement shall not preclude or prejudice the exercise thereafter of the same or other rights under this Agreement.

28.5   Consents and Approvals.  Except as otherwise may be specifically provided, the consent or approval of SCH to any action, undertaking, or otherwise of ICE addressed in this Agreement may be conditioned, delayed, or withheld in SCH's sole discretion.

28.6   Survival. Except as otherwise specifically stated herein, any terms of this Agreement that by their nature extend beyond its expiration or termination, including without limitation, indemnification, ownership and disposition of intellectual property and data, confidentiality, and audit, shall remain in effect until fulfilled and shall apply to the parties' respective successors and assigns.

28.7   Force Majeure.  In the event that any party to this Agreement cannot perform its obligations hereunder because of any event beyond its control, then the Party so affected shall, while so affected, be relieved to the extent it cannot perform its obligations.  The affected Party shall, however, take all reasonable measures to remove the disability and to resume full performance at the earliest possible date.  If any party cannot perform its obligations in part or in full as a result of an occurrence set forth in this section, it shall give prompt notice in writing to the other party.  The notice shall state the nature of the occurrence, the steps being taken and intended to be taken to remove the disability, and an estimate of the date when full performance will resume.

28.8   Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Georgia.  ICE hereby consents to the exclusive jurisdiction of the courts in Dekalb County, Georgia and the U.S. District Court for the Northern District of Georgia with regard to any lawsuit, action or proceeding related to this Agreement.

Disputes. In the event of a dispute, and prior to filing any litigation, the parties agree to escalate discussions to at least a Senior Vice President level in each company and to discuss in good faith the possible utilization of alternative dispute resolution procedures, including, but not limited to, non-binding mediation.

Litigation Costs. In the event of any action, suit or proceeding related to this Agreement, the prevailing party, in addition to its rights and remedies otherwise available, shall be entitled to receive reimbursement of reasonable attorney's fees and expenses and court costs.

28.9   Counterparts. This Agreement may be executed in counterparts, all of which when taken together shall be one and the same document.

9

28.10   Entire Agreement.  This Agreement is the entire understanding of the parties in relation to its subject matter and no other agreement or understanding, oral or otherwise, relative to its subject matter exists between the parties at the time of execution of this Agreement.  This Agreement supersedes and cancels any previous oral or written agreements between the parties with respect to the subject matter hereof.  Any and all prior representations or agreements by any agent or representative of either party are null and void.  Any waiver, modification or amendment to this Agreement must be in writing and signed by authorized representatives of both parties. The following Schedules attached hereto are incorporated into this Master Agreement.

Schedule A – Scope of Services and Rates – Fees
Schedule B – Estimated Pricing
Schedule C – Sample Order Form
Schedule D – Sample Shot List Form
Schedule E – Hotel Preparation Guidelines
Schedule F – Service Level Agreement
Schedule G – Services Agreement
Schedule H – ICE Portal Distribution Partners

**IN WITNESS WHEREOF,** each party hereto has caused this Agreement to be executed by an authorized person as of the date first above written.

SCH:                                                 ICE PORTAL, INC.:

**SIX CONTINENTS HOTELS, INC.**                       _____

By: _____       By: _____

Name: _____       Name: _____
     (please print)                                      (please print)

Title: _____       Title: _____

Date: _____       Date: _____

**SCHEDULE A**
**Scope of Services and Rates/Fees**


I.      **OVERVIEW**

ICE produces and distributes digital content to numerous websites in the travel industry.

SCH wishes to retain ICE, its photographers, videographers, freelancers, contractors, and any hired production company, herein referred to as "ICE CREW", to produce virtual tours, digital videos and still photography for its licensed, managed and franchised hotels.

Under this Agreement, SCH also wishes to retain ICE to enable the digital distribution of interactive brochures that encompass still photography, interactive floor plans, videos, and virtual tours for SCH and its licensed, managed and franchised hotels.


II.     **DEFINITIONS**

1. **Content –** for the purposes of this Agreement, "Content" shall be defined as any content produced or distributed by ICE Portal for Client.

2. **Participating Hotel –** for the purposes of this Agreement, "Participating Hotel" shall be defined as any InterContinental branded hotel that 1) has opted to purchase ICE products; and 2) that signs an Order Form specific for their Hotel.

3. **ICE CREW –** Production Coordinator, photographers, videographers, and hired production personnel working for ICE to complete the work described in this Agreement.

4. **Interactive Brochure –** for the purposes of this Agreement, "Interactive Brochure" shall mean an interactive web-based product, designed to market SCH's Participating Hotels and specifically Hotels' videos, virtual tours, still photography, and interactive floor plans.

5. **IHG (SCH) DAM–** InterContinental Hotels Groups (SCH), utilizes the services of a third-party in providing IHG with a Digital Asset Management (DAM) platform. The DAM serves as SCH's centralized repository for the management and distribution of digital assets (images, maps, room diagrams, virtual tours, and captions) to the GDS, switches, travel channels and SCH brand websites.

6. **360 Virtual Tours –** 360 degree panoramic imagery

7. **Video –** 1-2 minute digital video, shot on location at the Participating Hotel and edited with music and/or voice over, compressed and then optimized for streaming on the Internet.

III.     **SCOPE**

The scope of this Agreement includes the production of rich media content, provision of Interactive Digital Brochures for each Participating Hotel and distribution of these Interactive Digital Brochures for Hotels specifically in the context of the IC Meetings Project. ICE agrees to complete the following work under this Agreement:

1. <u>IHG DAM Integration</u>
   a) In order to allow SCH and Participating Hotels to manage content and Interactive Brochures produced by ICE, ICE agrees to work with the provider of the IHG DAM to interface and provide seamless integration and access to ICE's content management tool.
   b) For the purposes stated above, ICE and the provider of the IHG DAM will demonstrate the error-free functionality of the content management tool within the IHG DAM interface to the satisfaction of SCH before Hotels are first directed to approve, configure, or manage their content and Interactive Digital Brochure through the interface.

    c)  ICE assumes responsibility for uploading of all content it produces under this Agreement to the IHG DAM. Furthermore, ICE agrees to upload all final, approved content no more than one (1) week after content is approved by SCH.

2. Content Specifications
   a) ICE understands that all Content it produces for SCH and Hotel under this Agreement must conform to specific requirements in order for this Content to be displayed on SCH's website.  ICE shall ensure that Content produced meets SCH's specifications for the following:
      i. Format
      ii. Size
      iii. Resolution
      iv. Encoding & aspect ratio (video)
      v. Compression/quality of photographs
   b) For every 360° panoramic image ICE produces for SCH and its Participating Hotels, ICE will also produce and upload to the IHG DAM a 69 x 69 pixel image to be associated with each panoramic image in .gif or .jpg. file format.
   c) For every video ICE produces for SCH and its Participating Hotels, ICE will also produce and upload to the IHG DAM the following:
      i. A 408 x 306 pixel image and a 69 x 69 pixel image to be associated with each video.  The 408 x 306 image and 69 x 69 image can be of the same graphic, just different sizes.  Both images to be delivered in either .gif or .jpg file format.

3. Content Production
   a) Advanced Preparation
      i. ICE will distribute an Order Form to each Participating Hotel and interested Hotels will complete the Order Form, detailing the specific number and types of rich content desired (photographs, virtual tours, videos) and suggested date range for an on-site shoot. A sample of this Order Form is attached in Schedule C herein.
      ii. f Upon receipt of Order Forms from the Participating Hotels, ICE will submit at regular intervals, or upon request, an updated master shooting schedule to SCH for approval.
      iii. For each Participating Hotel that completes an Order Form, ICE will assign an ICE Crew, create travel itineraries and reservations. In addition to the Order Form, ICE will send a Shot List to each Participating Hotel. The completed Shot List is intended to document the specific rooms or areas the Participating Hotel wishes to have photographed and/or videotaped.  An example of the Shot List is included herein as Schedule D.
      iv. A non-refundable deposit representing fifty percent (50%) of the total cost of production must be received by ICE Portal no less than thirty (30) days prior to the arrival of the ICE Crew for the scheduled shoot. For cancellations received in writing more than forty eight (48) hours of the scheduled arrival of the ICE Crew, one hundred percent (100%) of the deposit will be applied to the rescheduled shoot, less any actual expenses incurred by ICE including cancellation or change fees. Cancellations received in writing within forty eight (48) hours, representing two consecutive business days of the arrival of the ICE Crew, fifty percent (50%) of the deposit shall be forfeit. Cancellations that occur after the departure of the ICE Crew from their home base location(s) shall be forfeit in their entirety. For the purposes of this section, e-mail is an acceptable form of written communication.
      v. Two weeks before the scheduled shoot at the Participating Hotel, ICE will send an email reminder to the Participating Hotel(s), including guidelines on how to prepare for the shoot.  A sample of the email reminder and preparation guidelines can he found in Schedule E herein.
      vi. Each Participating Hotel will identify an on-site representative(s) to work with ICE CREW. These Participating Hotel representatives should plan on accompanying the ICE CREW throughout the shooting.
      vii. Prior to shooting, Participating Hotel will prepare/clean/set up rooms/areas to be photographed. This may include restricting access to guests during designated times.
   b) Location Shooting
      i. ICE CREW will meet with Participating Hotel representative to review shooting schedule, scout the property, and ensure all areas for the shoot are cordoned off as necessary.
      ii. ICE CREW will photograph each location on the Shot List.
      iii. ICE CREW and Participating Hotel representative will inspect the area for lighting, cleanliness, placement of furniture, etc.
      iv. Participating Hotel representative will approve each area when it is ready to be shot
      v. ICE CREW will complete the photography and/or video shoot. ICE CREW will work collaboratively with Participating Hotel Representative to capture the best angles and perspectives from the Shot List.
   c) Post Production & Approval of Digital Content

    i.    Within five (5) weeks of returning from a Participating Hotel's production shoot, ICE will produce final edited photographs, virtual tours and/or videos for the approval of the Participating Hotel..

    ii.   During the various stages of Post Production, when content is ready for a Participating Hotel's review and/or approval, ICE will notify and instruct each Participating Hotel how to access the images so that the Hotel can approve unretouched Final Selects and initial edited version(s) of any videos and ultimately the finished product.

   iii.  ICE will receive feedback from Participating Hotels and all final photos, videos and virtual tours will be enhanced, edited or stiched as needed.

   iv.  Minor touch ups, color corrections, saturations and general image clean up, and editing processes requested by Participating Hotels will be accommodated at no additional cost. Major changes will be charged at $75 per hour for each hour of work needed to make the requested change(s) – Major changes would include adding or deleting objects in the image (i.e. people, furniture, etc.) that were or were not included in the original filming.

    v.   If Participating Hotel requests changes to an image and video content that requires additional scope, work or fees, a schedule and any applicable charges for those changes will be determined by ICE and submitted to Participating Hotel for its written approval at that time, prior to incurring any additional costs.  Additional scope may include, for example, adding or deleting objects in an image that were included in the original shot.

   vi.  Final approval of all Content will be solicited and confirmed via email between ICE designee and Participating Hotel designee.

4.   <u>Content Distribution</u>
   a)  Once a Participating Hotel's Content has been approved by SCH, ICE will create and present the Hotel's Interactive Brochure for approval.
   b)  Once approved, within two (2) business days of approval, the Interactive Brochure will be published to ICE's servers and made available to all SCH-approved ICE distribution partners noted in Schedule H of this Agreement.
   c)  ICE will provide SCH and Participating Hotel with all necessary training and documentation on how to manage their Interactive Brochures.

5.   <u>Provision of Multiple Languages</u>
   a)  ICE understands that SCH and its Participating Hotels support a global customer base.  ICE must ensure deployment of its Interactive Brochure in multiple languages.  For the initial launch of the Interactive Brochure from SCH's website, ICE will provide its Interactive Brochure for each Participating Hotel in English, Spanish, French, German, Italian, Chinese, and Japanese.
   b)  For an additional cost, ICE will also provide its Interactive Brochure in Korean to be integrated and deployed within sixty (60) days following the execution of this Agreement.

6.   <u>Hosting of Interactive Brochures</u>
   As further defined in the Services Agreement included in this Agreement under Schedule G, ICE will host, maintain and provide technical support for its Interactive Brochures for SCH and Hotels.

## IV. ADDITIONAL TERMS & CONDITIONS

1.   ICE CREW has been engaged by SCH to provide Content production services for its Participating Hotels for an agreed upon price based on the product menu and corresponding price list as reflected in Schedule B. It is understood, however, that total price for each Participating Hotel will be reflected and in the Order Form that will be presented to each Participating Hotel. All prices are quoted by ICE will be in United States Dollars and it is understood that invoicing will be carried out by ICE.  Each Participating Hotel shall be solely responsible to ICE for the payment of any fees, including but not limited to Annual Fees, in such Order Form and/or Services Agreement. ICE understands and agrees that SCH shall not be liable for Participating Hotels obligations. However, in the event a Participating Hotel becomes delinquent in remitting payment to ICE, ICE shall notify SCH and SCH shall contact the Participating Hotel to assist in securing payments due to ICE.

2.   Participating Hotels will be responsible for travel related expenses for the ICE Crew including yet no limited to, airfare, accommodations at the Participating Hotel, meals, and transportation to/from the Participating Hotel and the airport.

3.   In the event of a delay after the arrival of the ICE Crew beyond the control of either party (e.g. weather), ICE shall be responsible for any additional personnel related expenses (e.g. salary) and the Participating Hotel agrees to extend the accommodations and related travel expense for the duration of the shoot and agrees to reimburse ICE for any actual expenses incurred as a result of the changes.

4.  SCH has the right to approve and/or reject or request modification to the terms and conditions set forth in the Order Form.

5.  The annual fee for licensing, hosting, distribution and maintenance of the Content and Interactive Brochure (the "Annual Fee") is subject to the terms and conditions provided for in the Services Agreement in Schedule G of this Agreement.  The effective date of the Participating Hotel's Annual Fee commences at the time the approved Interactive Brochure is published live on SCH's website or otherwise put into distribution (the "Effective Date").

6.  Sixty (60) days before the renewal date of Participating Hotels' Annual Fees, a renewal invoice will automatically be sent to Participating Hotels, extending the term for another year.

7.  It is understood that ICE will invoice Participating Hotels directly for renewal of all Participating Hotels Annual Fees.  ICE will notify SCH of any delinquent renewal fees in sufficient time so that SCH may prevent service interruptions of the Interactive Brochure on SCH's website.

8.  Shooting of videos, still photography and virtual tours will take place on location at Participating Hotels.  The shoot dates for specific Participating Hotel will be determined via an Order Form.

9.  ICE and ICE CREW will make best efforts to minimize travel expenses by shooting multiple hotels in the same geographic area, subject to the requested shooting dates of Participating Hotels. Travel expenses shall conform to Client's standard travel policies for vendors.

10. ICE agrees to abide by all terms and conditions set forth in the Service Level Agreement provided in Schedule F of this Agreement.

11. In order to allow SCH and Participating Hotels to manage content and Interactive Brochures produced by ICE, ICE agrees to integrate with SCH's intranet protocols in order to facilitate single sign-on to ICE's content management tool through SCH's Merlin interface.

12. ICE will provide a daily XML feed to SCH for the purposes of syncing any and all updates to Interactive Brochures and relevant links.  ICE will participate and support all testing of this XML feed prior to launch of the new meetings pages on InterContinental.com.

13. ICE agrees to consume SCH existing media XML feed (as stored on Net Storage) in order to update all Interactive Brochures.

**SCHEDULE B**

**PRICING**

**CONTENT PRODUCTION**

| | PRICE |
|---|---|
| | |
| **Virtual Tour / Photography– 10 Images**<br>• Production on location + PhotoShop enhancement of all 10 images (photos and/or virtual tours)<br>• Additional Images billed at $200 each | $2,750 |
| | |
| **Digital Video (basic package)**<br>• 1-2 minute video optimized for streaming<br>• Pre-production and on 1/2 day on location production on location<br>• Post Production - Editing and Music<br>• Optional: Scripting and Voice Over for add $ 1,500 | $7,500 |

**CONTENT DISTRIBUTION  (Interactive Brochure)**

| | Annual Fee – Year 1 |
|---|---|
| w/ Virtual Tour & Still Photos | $1,750 |
| w/ Video | $1,500 |
| • | |
| **Annual RENEWAL Fees (Hosting, Management & Distribution)** | Annual Fee – Year 2+ |
| w/ Virtual Tour & Still Photos | $1,195 |
| w/ Video | $1,995 |
| | |

| Multi-Hotel Discounts | Rate |
|---|---|
| | |
| 1-20 Hotels | 0% discount |
| 21-50 Hotels | 5% discount |
| 51-100 Hotels | 10% discount |
| 101+ Hotels | 15% discount |
| | |

## SCHEDULE C

## Sample Order Form

# Order Form

**ICE**Portal
*Internet Content Exchange*

Date _____

Select Type _____

## Client Information

Client Name _____

Company _____

Address 1 _____

Address 2 _____

| City | | State/Province | |
| Postal Code | | Country | |
| Phone | | Fax | |
| Email | | | |

ICE Portal
3595 Sheridan Street
Hollywood, FL 33021
USA

Phone:   954-893-6778
Fax:      954-893-6779
www.iceportal.com

### ICE Portal Use Only

| ID # | |
| Partner | |

## Billing Information   ☐ Same as Above

Client Name _____

Company _____

Address 1 _____

Address 2 _____

| City | | State/Province | |
| Postal Code | | Country | |
| Phone | | Fax | |
| Email | | | |

[ Print Form ]

**Billing Option**   ◉ Annual      ○ Biannual      ○ Quarterly      ○ Monthly

**Payment Method**  ◉ Check payable to ICE Portal, Inc.     ○ Wire transfer

| Service | Description | Quantity | Unit Price | Adj. Price | Amount |
|---|---|---|---|---|---|
| | Virtual Tours and/or Photos (10 images) | | $2,750.00 | $2,750.00 | $0.00 |
| | Additional Images | | $200.00 | $200.00 | $0.00 |
| | Web Show (8-10 image photo-video montage) | | $950.00 | $950.00 | $0.00 |
| Production | Optional Scripting & Voice Over | | $1,000.00 | $1,000.00 | $0.00 |
| | Basic Video (1-2 minute) | | $7,500.00 | $7,500.00 | $0.00 |
| | Optional Scripting & Voice Over | | $1,500.00 | $1,500.00 | $0.00 |
| | Deluxe Video (1-2 minute) | | $12,995.00 | $12,995.00 | $0.00 |
| | *Property may be responsible for travel expenses plus lodging & meals* | | | | |
| | Virtual Tours (1st year) | | $1,500.00 | $1,500.00 | $0.00 |
| Distribution | Web Show (1st year) | | $1,250.00 | $1,250.00 | $0.00 |
| | Streaming Video (1st year of 1-2 minute video) | | $2,500.00 | $2,500.00 | $0.00 |
| | *Distribution fees include all content hosting, management, maintenance, distribution and reports* | | | **Total** | **$0.00** |

BY SIGNING BELOW, PARTY ACKNOWLEDGES AND AGREES THAT: UNLESS INDICATED OTHERWISE, SERVICES ARE CHARGED UPON COMPLETION OF WORK AND ARE PAYABLE WITIN THIRTY (30) DAYS FROM RECEIPT OF EMAIL GENERATED INVOICE; ANY RATES INDICATED IN THE RATE INFORMATION OF THIS AGREEMENT WILL REMAIN IN EFFECT FOR THE TERM OF THIS AGREEMENT; AND IT HAS READ AND AGREES TO BE BOUND BY THIS TERMS AND CONDITIONS.

**Agreed to and accepted on behalf of the company by:**

Sign _____

Name _____

Title _____

Use of ICE Portal's Distribution System will require clients to adhere to the Terms and Conditions for use of site. **Terms and Conditions** can be seen online at: **http://www.iceportal.com/ICE/WTVPortal/Pages/ HRTermsConditions.html**

| Distribution Fees Beginning in Year 2 | Annual | Biannual | Quarterly | Monthly |
|---|---|---|---|---|
| Virtual Tour / Web Show | $1,195.00 | $633.35 | $334.60 | $117.51 |
| Streaming Video | $1,995.00 | $1,057.35 | $558.60 | $196.18 |

**SCHEDULE D**

Shot List Form



## Client – Shot list for virtual tour photography

Please carefully review this tentative list of the rooms/areas we plan to shoot while photographing your facility for your interactive virtual tour. **A standard package will include the shooting of 10 images.** (VTs and/or Photos) -The photographer will take 12 setups and you can pick the best 10

In order to ensure that we've scheduled enough time to capture all the shots you desire, please look over this list and feel free to make additions or cross out any shots you do not want taken.

If you are uncertain about what images you would like, please list everything you might like so that we can allow adequate time to cover everything you may want.

NOTE: Once completed, this shot list must be signed and returned to our office before we arrive for your photo shoot FAX (954) 893-6779, or we will have to reschedule to a later date.

**TENTATIVE SHOT LIST:**
*Please check each room or area you wish to have shot and photography type for each, cross out any you do not wish to be photographed, and add any additional rooms or areas you wish to have photographed.*

**Check 12 desired locations** (each image over 12 will be charged an additional rate of $150 per image)

| | |
|---|---|
| ❑ Front Exterior | ❑ King Room |
| ❑ Lobby | ❑ Guest Room |
| ❑ Restaurant / Dining | ❑ Suite Room |
|     Name _____ |     Sitting Area |
|     Name _____ |     Bedroom |
| ❑ Lounge / Bar | ❑ Conference Room: |
|     Name _____ |     Set-up type_____ |
| ❑ Business Center | ❑ Boardroom |
| ❑ Pool | ❑ Other _____ |
| ❑ Fitness Center / Spa | ❑ Other _____ |

Additional comments: _____
_____
_____
_____

Date:_____

NAME (Please print):_____

Signature:_____

Hotel Name: _____

**PLEASE NOTE:** In order to avoid additional costs in post-production, rooms must be adequately prepared for the shoot prior to the photographer's arrival. The scope of work provided as part of the ICE Portal services includes processing, stitching, color-correcting, retouching, optimizing images, and blending. Work outside the scope of services includes, but is not limited to, adding items that were not originally in the photographed area, removing items from the area, rearranging items or furniture, ironing sheets and curtains, and cleaning windows. Photoshop work beyond the scope will be charged a rate of $75 an hour.

**A:** 3595 Sheridan Street, Suite 200 ● Hollywood, FL  33021 ● United States
**P:** 954-893-6778     ●     **F:** 954-893-6779     ●     **W:** www.**ICE**portal.com

17

**SCHEDULE E**

## Hotel Preparation Guidelines

Dear [Contact Name]

This e-mail is just a friendly reminder to let you know that, ___[photographer]___ , ICE Portal's photographer is expected to arrive at your hotel on ___[day]_ at ___[time]_ o'clock.

The dates for filming your hotel will be _____[dates of shoot]_____

___[photographer]___   will be filming the lobby, restaurant(s), 2-3 room categories, pool, beach, conference/meeting room(s), and anything else that you request. [He/she] will be staying overnight on___[dates for overnight stay]___ and leaving ___[departure date]_ . I have instructed [him/her] to ask specifically for you when [he/she] arrives, if there is anyone else that [he/she] needs to contact, please let me know.

In general, exterior shots are best taken around mid-day when the sun is high overhead. Interior shots must be void of all people, and for that reason it is best to shoot the lobby early in the morning and restaurants before the main seating. Each shot only takes about 15-20 minutes to film.  Below you will find a few suggestions to prepare for the filming of your property:

- **Restaurants & Bars** – These interiors need to be shot without people in them. If some restaurants or bars are to be filmed are only open for dinner, please have them set-up prior to filming (they could be left set up from the night before)
- **Public Areas** – Any public areas to be shot should be ready for filming (lighting, set ups, etc.)
- **Rooms** – Sheets need to be ironed and curtains should be open.
- **Pools & Beaches** – Exteriors are best shot around noon when the sun is high overhead
- **Support** – In addition to a hotel rep escorting the photographer around the property, you might consider having a maintenance person on call (to turn on lights in areas that may be unfamiliar to the hotel rep.)

Should there be people in any of the shots, every individual that appears in the photograph will need to sign a talent release form.  The photographer will have these forms on hand, however, if you are planning a photo shoot featuring any talent, it is recommended that these forms be filled out prior to the photographer's arrival to save time during the photo shoot.

I have also attached a shot list for you.  This needs to be filled out, signed, and faxed back to me at 954-893-6779 *within five (5) business days*.  Thank you all your help, I appreciate you working with our schedule.  If you have any questions or need any additional information, please do not hesitate to contact me.

Best Regards,

___[ICE Employee]___
___[Employee Title]___

**SCHEDULE F**

**Service Level Agreement**

The purpose of this Service Level Agreement ("SLA") is to detail the service level expectations, requirements, and escalation paths for Agreement between [Distribution Partner] ("Distributor") and ICE Portal, dated as of [DATE] (the "Agreement"). Terms not defined shall have the meaning set forth in the Agreement.

1. Definitions
   1.1. **Downtime** shall mean the number of minutes per month that the Services are not available using continuous measurement.
      1.1.1. **Permitted Downtime** shall mean the Service Availability Requirement exceptions detailed under "Availability Exceptions."
      1.1.2. **Unplanned Downtime** shall mean all Downtime that is not Permitted Downtime.
   1.2. **Issues** shall mean Availability problems with the services described in this contract, classified as Severity 1, Severity 2, and Severity 3.
   1.3. **Measured Pages** shall mean web pages displaying services covered by this contract.
   1.4. **Service Availability** shall mean a percentage calculated as follows: (Uptime minutes in calendar month) divided by (total minutes in calendar month – Permitted Downtime).
   1.5. **Service Availability Requirement** shall mean an overall average Service Availability of ninety-nine point ninety nine percent (99.99%), as determined on a calendar month basis for Measured Pages.
   1.6. **Services** shall mean all services described in this contract.
2. Requirements
   2.1. Service Availability Requirement
      2.1.1. Availability. The parties will cooperate in good faith to provide the Services in a manner that satisfies the Service Availability Requirement. Normal hours of operation for the Services are considered to be 24x7x365. Any period of Unplanned Downtime will contribute to the responsible party's total monthly sum of Unplanned Downtime.
      2.1.2. Capacity Objective. A party will be able to accommodate up to 27,000 simultaneous requests per minute.
      2.1.3. Page Load Time Objective. A party will be able to provide Virtual Tour Content in an average response time that does not exceed 6s
3. Issue Criteria
   3.1. Severity 1 Issue. A Severity 1 Issue is any problem that causes Unplanned Downtime or a primary feature to fail.
   3.2. Severity 2 Issue. A Mid-Priority Issue is an Issue that causes serious business impact, including:
      3.2.1. Slow system response time beyond the page load time objective
      3.2.2. Presentation issues that are inconvenient to a user but can be worked around
      3.2.3. Other issues that affect less then 5% of users
   3.3. Severity 3 Issue. A Severity 3 Issue is one that is not classified as a Severity 1 Issue or a Severity 2 Issue.
4. Reporting and Escalation Procedures
   4.1. Initial Reporting. Each party shall report Issues to the other party's Primary Technical Contact, as set forth in this Schedule F (which may be updated from time to time by the parties upon written notice).
   4.2. Reporting Requirements. When reporting an Issue, the reporting party will promptly provide the following information:
      4.2.1. The particular Service(s) that is (are) experiencing an Issue;
      4.2.2. The name of the individual who is making the report;
      4.2.3. An e-mail confirmation address, phone number, or comparable information to facilitate immediate communication with the individual reporting the Issue;
      4.2.4. All relevant information regarding the Issue; (i.e. start time, expected end time, stop time, description of impact, etc.)
      4.2.5. A unique tracking number or other identifier
5. Prioritization. With the input of the reporting party, the receiving party will assign each reported Issue a priority level based on the criteria set. If either party discovers any Severity 1 Issues, such party will promptly notify the other party.
6. Response Times.
   6.1. Severity 1. A party will respond to a Severity 1 Issue within thirty (30) minutes, submit status reports to the other party's Primary Technical Contact on progress every thirty (30) minutes, and use commercially reasonable efforts to resolve the Issue as soon as possible.

    6.2. Severity 2. A party will respond to a Severity 2 Issue within one (1) hour, submit status reports on progress to the other party's Primary Technical Contact every one (1) hour, and use commercially reasonable efforts to resolve the Issue within four (4) hours.

    6.3. Severity 3. A party will respond to a Severity 3 Issue within one (1) business day, submit status reports to the other party's Primary Technical Contact each one (1) business day, and use commercially reasonable efforts to resolve the Issue within one (1) week.

7.  Service Level Measurements

    7.1. Distributor NOC will make a content request every 2 minutes to a party and measure the average response times based on complete rendering of the tour.

    7.2. Measurements of 3 consecutive requests that are over 6s will be deemed unsatisfactory and will prompt the following:

        7.2.1. A call from the Distributor NOC to Virtual Tour Vendor.

8.  Limited Remedies

    8.1. Termination Rights. In the event that either party fails to meet its respective Service Availability Objective for three (3) consecutive calendar months during the Term (excluding the first such instance occurring in the first, second, or third calendar month after the Launch Date), the other party may terminate the Agreement upon thirty (30) days prior written notice to the other party.

    8.2. Sole and Exclusive Remedies. THE TERMINATION RIGHTS DESCRIBED IN THIS SECTION IV ARE A PARTY'S SOLE AND EXCLUSIVE RIGHTS AND REMEDIES AND A PARTY'S SOLE AND EXCLUSIVE LIABILITIES FOR ANY FAILURE TO MEET ANY OF THE REQUIREMENTS SET FORTH IN THIS EXHIBIT A

9.  Availability Exceptions

    9.1. Unlike traditional service organizations that provide service level agreements, Internet services are routinely impacted by events that cannot be controlled and may negatively impact Service Availability. Each party will make commercially reasonable efforts to communicate any Unplanned Downtime as soon as possible. Accordingly, the occurrence of any one of the following events will constitute an exception to either party's obligation to meet the Service Availability Requirement (including the Capacity Objective and Page Load Time Objective), and will be considered Permitted Downtime:

        9.1.1. An outage or slowdown that is due to the failure or non-performance of any equipment, connections, entities, individuals, or services that are not under the direct reasonable control of a party, including, but not limited to, peer-to-peer Internet service provider routing, 3rd party data center failure, insufficient or inadequate 3rd party bandwidth or technology, etc;

        9.1.2. An outage or slowdown caused by an event that is beyond the reasonable control of a party, including, but not limited to, acts of God, acts of any government in its sovereign or contractual capacity, terrorist acts, fires, floods, snowstorms, earthquakes, epidemics, quarantine restrictions, wars, riots, rebellions, insurrections or civil unrest, strikes or other work stoppages, Internet viruses, hacker attacks such as "Denial of Service", and general Internet brown-outs, black-outs and slowdowns;

        9.1.3. An outage or slowdown attributable to an increase in traffic that brings page requests above the agreed upon capacity.

        9.1.4. An outage or slowdown caused by planned maintenance.

            9.1.4.1. Planned maintenance may occur for no more then 2 hours each week, between the hours of 2 AM Central Time and 4 AM Central time, Saturday and Sunday. ("Maintenance Window") During the Maintenance Window, one server will be taken out of rotation at given time and the content delivery will continue uninterrupted.

            9.1.4.2. Commercially reasonable efforts shall be made to minimize planned maintenance outages.

            9.1.4.3. Should the actual outage or slowdown exceed the Maintenance Window, it will be counted as Unplanned Downtime for the calendar month.

10. ICE Portal agrees to support HTTPS protocol and will provide SCH with all necessary certificates or other documentation to ensure that this protocol is working and performing as expected. Further, ICE will participate and support all testing of this HTTS functionality prior to launch of the new meetings pages on InterContinental.com.

11. As part of its disaster recovery service / plan, ICE Portal certifies that it uses a server farm that allows ICE to operate should one or more individual servers fail or need to be taken offline for maintenance. The ICE database and content is replicated continuously on multiple servers which are backed up nightly. The servers themselves all use RAID hard drives that provide real-time recovery in case of hard drive failure as well as SMART to predict hardware failure and allow drive replacement before data loss.

ICE Portal Contacts

*Primary Technical Contact*
Joe McMahon
Joe@iceportal.com / support@iceportal.com
Tel: 954-893-6778
Cell: 617-512-8186

*Secondary Technical Contact*
Nikunj Virani
Nikunj@iceportal.com / support@iceportal.com
Tel: +91-20-66041700 ext. 1513
Cell: +91-9960840203

*Primary Business Contacts*
Steve Tipsword
Steve@ICEportal.com
Tel: (954) 893-6778
Cell: (954) 804-6694

Henry Woodman
henry@iceportal.com
Tel: 954-893-6778
Cell: (954) 224-9585

## SCHEDULE G

### SERVICES AGREEMENT
#### (For Content Production & Digital Distribution Services for Hotel)

The "ICE Portal," operated by ICE Portal, Inc. ("ICE"), is comprised of various Web elements, media, links and Web pages. The ICE service is offered to you conditioned on your acceptance of the terms, conditions, and notices contained herein. Your use of the ICE portal constitutes your agreement to all such terms, conditions, and notices.

PLEASE READ THE FOLLOWING TERMS OF USE AND DISCLAIMERS CAREFULLY BEFORE USING THIS SERVICE. By accessing or using the ICE Portal, you agree to these terms of use, conditions and all applicable laws. If you do not agree to these terms you may not use this service.

### MODIFICATION OF THESE TERMS OF USE
ICE reserves the right to change the terms, conditions, and notices under which ICE Portal is offered, including but not limited to the charges associated with the use of the ICE Portal, with prior written notice.  You are responsible for regularly reviewing these terms and conditions.

### USE OF ICE PORTAL SERVICE - PROFESSIONAL AND COMMERCIAL USE

ICE Portal is a service that was designed to be used by the travel trade. Travel Suppliers (Hotels, Cruise Ships, Destinations, etc.) use the ICE Portal to manage and distribute content to travel industry distribution channels. Each supplier "Licensor" of Content (defined below) grants ICE the following rights:

**Rights Granted**: The Participating Hotel or SCH as applicable (Licensor) hereby agrees that, by using the ICE Portal, Licensor assigns to ICE a non-exclusive, perpetual license to its "Content" (Content means any data that can be stored in a database including text (sales copy), graphics (maps & floor plans), traditional photography (photos), virtual tours (360° panoramic images and/or streaming video), videos, audio, or any other content uploaded into ICE Portal). Licensor grants to ICE, for use in the ICE Portal database, a non-exclusive license to encode, digitize, distribute, transmit, and repurpose the Content, throughout the universe of the Internet. The Licensor agrees not to distribute copyright protected content, and/or data to which they do not have the rights, as it relates to this Agreement.

**Additional Rights:**  ICE and/or its assigns shall also have the right to use the Content for the purposes of marketing and promoting the hotel and/or ICE and/or its assigns and promoting its production and, and distribution services.

**License, Hosting and Distribution Term:** Subject to the terms hereof, this Agreement shall be effective for a period of time commencing on the "effective date" (date approved Interactive Brochure was published live and put into distribution) hereof and continuing for the time period agreed to in the Annual Fees for hosting, maintenance and distribution (unless otherwise agreed to in writing).

**Optional Annual Renewal Fee:** The renewal fee shall commence one year after the effective date. If Licensor is more than 60 days delinquent on renewal payment, ICE shall have the right to remove Licensor's Content from distribution.

**Renewal:** Thereafter, this Agreement shall renew for consecutive one year terms, (each, a "Renewal Term"), unless terminated by either party in writing no later than sixty (60) days prior to the Expiration Date or terminated by ICE with our without notice, upon a breach by Licensor of these Terms and Conditions.

**Ownership: as to Content Provided by Licensor to ICE Portal:** As between ICE and/or its assigns and Licensor, ICE and/or its assigns acknowledges and agrees that the Content and the goodwill associated therewith are the sole and exclusive property of Licensor and that all use of the Content by ICE and/or its assigns shall inure to the benefit of and be on behalf of Licensor.

**Distributor (3rd parties) Use**: Licensor and/or its assigns will offer Licensee, on a non-exclusive basis, all Content digitized by ICE and/or its assigns pursuant to this Agreement, for Licensee to host within its website or distribution channels and distribution center.  In addition, Licensee shall have the non-exclusive right to license the Content for use on individual third party websites and channels, provided such third party websites and channels shall have no right

22

(except affiliated or subsidiary companies) to syndicate, license or otherwise distribute such Content to other third parties.

**Warranties**:  No Content provided or uploaded to ICE Portal and/or its assigns under this Agreement constitutes or shall constitute libel, obscenity, unlawful comparative advertising, false advertising or any other unlawful matter, or infringes in any manner any copyright, patent, trademark, trade secret, right of publicity or any other intellectual property right or any other right of any third party.

**Rights for Distribution:** ICE Portal grants the travel trade the right of use to all Content, service and technology within the ICE database. This right of use consists of the rights to access, consult and link to Content contained in the ICE Portal database. Use of the Content is for the sole purpose of promoting and marketing these elements of the Content to the travel industry clients.

In no event does the right of use include a right to use the retrieved Content, in whole or in part, to compile a media database, either by or through the such user (except by written agreement with ICE Portal), or to otherwise use the Content for purposes that compete with ICE, its affiliates or partner companies.

Harassment in any manner or form on the ICE Portal or any of the ICE websites (the "Site"), including via e-mail and chat or by obscene or abusive language is strictly forbidden. Impersonation of others, including an ICE Portal employee, host, or representative or other members or user on the ICE Portal is prohibited.

You may not upload, distribute, or otherwise publish through the ICE Portal any Content which is libelous, defamatory, obscene, threatening, invasive of privacy or publicity rights, abusive, illegal, or otherwise objectionable, or which may constitute or encourage a criminal offense, violate the rights of any party or otherwise give rise to liability or violate any law.

## USE OF ICE PORTAL PRODUCTION CREWS

1.  The ability of ICE CREW to provide the Client with professional Content is predicated on the complete and total cooperation of all parties associated with the event. ICE CREW shall not be held responsible for the lack of coverage due to the action or inaction of guests, vendors or any other persons associated with the event. Any restrictions imposed upon ICE CREW, limiting their ability to properly produce Content in a professional manner, i.e. camera placement, microphone placement, use of lights, backlighting, etc., is the full and complete responsibility of the Client without recourse upon ICE CREW.

2.  Client shall indemnify and hold ICE CREW harmless from all claims of damage, loss, cost or injury arising out of the production process and shall be responsible for any damage to ICE CREW's equipment or injury to ICE CREW personnel caused by Client's negligent acts or omissions.

3.  In the event ICE CREW is unable to provide the services specified for reasons outside its control, including but not limited to, mechanical equipment failure of any kind, inferior tape stock, human error, civil disturbances, weather conditions, on or before the date specified, and the hindrance by others at the event, it is expressly understood by the Client that the limit of ICE CREW's liability is expressly limited to a full refund of all monies paid without any further recourse on the part of the Client or Client's agent.

4.  This Agreement is made for the exact date(s), time(s) and location(s). The retainer is non-refundable. In the event of changes, ICE CREW may agree to the changes at the then current fees. Client will pay a rescheduling fee of $200.00 and will also be held liable for any related travel and booking expenses

5.  Client warrants that he/she has the legal rights to anything ICE CREW will videotape or photograph including photos, audio and any other elements included in the Client's Content production, and will hold ICE CREW harmless for any liability for infringement of any rights arising form the use of Content Client retains ICE CREW to produce.

## IMAGE RIGHTS FOR CLIENTS

This agreement between ICE and Client for photography services includes all work for Client by ICE, and/or any affiliated freelance photographer to produce any visuals (photos, virtual tours, video).
1.  Client will pay ICE a production/post-production rate as agreed upon by Client and ICE.  Payment will be made for visual material on submission of an invoice within thirty (30) days of completion.

2. ICE will obtain all necessary releases for photography services and shall perform everything necessary ensure that Client has all ownership rights to use the Content, including visuals, without additional cost.

3. Client will reimburse ICE for reasonable expenses provided that ICE submits acceptable documentation to Client within thirty (30) days of incurring the expenses.

4. ICE will deliver all visuals and/or digital images resulting from the assignment (the "Work").

5. Grant of Rights:

   a. ICE grants to Client the perpetual right to use, display and reproduce, and license others to use, display and reproduce, images produced in connection with any services ICE may perform hereunder, or in connection with the work for hire of ICE by Client.

   b. Client may perpetually use, or authorize others to use, any of the rights herein granted for commercial advertising or publicity in connection with any product, commodity or service manufactured, distributed or offered by Client, any distributor of the images, or their successors and assigns or ICE services rendered to Client.

   c. Notwithstanding anything herein to the contrary, in the event ICE's services hereunder, for any reason, are deemed not to be a work made for hire under the United States Copyright law, ICE acknowledges and agrees that by the terms hereof, ICE hereby irrevocably grants, sets over and assigns to Client throughout the universe, exclusively and in perpetuity, free and clear of any and all claims, liens and encumbrances, all right, title and interest of every kind whatsoever, whether now known or unknown, in and to the Material and all other results and proceeds of ICE's services hereunder.

   d. Subject to any express provisions to the contrary set forth in this Agreement, Client shall have the unrestricted right, but not the obligation, to make any changes in, deletions from or additions to the Material and/or the Image(s), or any part thereof. Client shall have the unrestrained right to use the Material and/or the Image(s) or any version thereof for any and all purposes throughout the universe in perpetuity in any and all media now existing or hereafter devised.

   e. ICE grant of rights in this Agreement is irrevocable and without right of termination or rescission by ICE & shall not be affected by termination or expiration of this Agreement.

6. ICE represents and warrants that it is entitled to grant to Client the foregoing rights in and to all Work submitted to Client and that the Work will be original and unaltered and that it will not infringe another's copyright or trademark, violate any person's right of privacy or contain libelous or otherwise unlawful material.  ICE agrees to cooperate fully with Client in responding to and defending against any third-party claims relating to the Work. ICE obligations under this paragraph will survive any termination of this agreement.

## COPYRIGHTS AND TRADEMARKS

The entire Content included in this Site, including but not limited to text, design, graphics, interfaces, or code and the selection and arrangements thereof is copyrighted as a collective work under the United States and other copyright laws, and is the property of ICE Portal, its affiliates, its partners and/or the clients represented within the ICE database. The collective work includes works that are licensed to ICE Portal. ALL RIGHTS RESERVED. All trademarks, service marks, and trade names (collectively the "Marks") are trademarks or registered trademarks of and are proprietary to the respective owner(s) that have granted ICE the right and license to use such Marks.

## TERM; TERMINATION

These terms and conditions are applicable to the Participating Hotel upon the  use of the ICE technology, service and Content. The provisions relating to Copyrights and Trademarks, Disclaimer, Claims, Limitation of Liability, Indemnification, Applicable Laws, Arbitration and General, shall survive any termination.

## USER PARTICIPATION

ICE Portal does not and cannot review and/or validate all Content, communications and materials in the ICE platform, and is not in any manner responsible for the erroneous Content and/or materials. You acknowledge that by providing you with the ability to view and distribute user generated Content on the ICE platform, ICE is merely acting as a conduit for such distribution and is not undertaking any obligation or liability relating to any misrepresented Content within the ICE database. However, ICE reserves the right to block or remove communications or materials that it determines to be (a) abusive, defamatory, or obscene, (b) fraudulent, deceptive, or misleading, (c) in violation of a copyright, trademark or; other intellectual property right of another or (d) violates any law or regulation or (e) offensive or otherwise unacceptable to ICE at its sole discretion.

Note that any personally identifiable information you may post or transmit will be treated by ICE in accordance with ICE's Privacy Statement

## USER SUBMISSIONS

Except for any personally identifiable information we may collect from you under the guidelines established in our Privacy Statement, any material, information or other communication you transmit, upload or post to this Site ("Communications") will be considered non-confidential and non-proprietary. ICE will have no obligations with respect to the Communications. ICE and its partners and/or affiliates will be free to distribute, incorporate and otherwise use the Communications and all data, images, sounds, text, and other things embodied therein for any and all commercial or noncommercial purposes.

## THIRD-PARTY LINKS

In an attempt to provide increased value to our clients, partners and users, the ICE database may contain links to other sites on the Internet that are owned and operated by third party vendors and other third parties (the "External Sites"). However, even if the third party is affiliated with ICE, ICE has no control over these linked sites, all of which have separate privacy and data collection practices, independent of ICE. ICE has no responsibility or liability for these independent policies or actions and is not responsible for the privacy practices or the content of such web sites. These linked sites are only for your convenience and to enhance the user experience. ICE seeks to protect the integrity of its ICE service and the links placed upon it and therefore requests any feedback on not only this Site, but for sites it links to as well (including if a specific link does not work).You should contact the Site administrator or Webmaster if you have any concerns regarding such links.

## DISCLAIMER

ICE makes no warranties or representations about the accuracy or completeness of this Site's content or the content of any site or External Sites.

ICE filters, reviews and approves Content stored in the ICE database, before it is "published" (goes live and becomes available for distribution). However, ICE will not be responsible for third party links or other content, linked through a third party, even if such content has been filtered and approved through the ICE Portal.

THE ICE PORTAL'S SERVICE AND THE CONTENT IN THE ICE DATABASE, INCLUDING WITHOUT LIMITATION, TEXT, GRAPHICS, AND LINKS, ARE REVIEWED AND APPROVED BY ICE, AND PROVIDED "AS IS" AND WITHOUT WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, ICE  DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, FREEDOM FROM COMPUTER VIRUS, AND WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. ICE DOES NOT REPRESENT OR WARRANT THAT THE FUNCTIONS CONTAINED IN THE SITE WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT THIS SITE OR THE SERVER THAT MAKES THE SERVICE AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. ICE  DOES NOT MAKE ANY WARRANTIES OR REPRESENTATIONS REGARDING THE USE OF THE MATERIALS IN THIS SITE IN TERMS OF THEIR COMPLETENESS, CORRECTNESS, ACCURACY, ADEQUACY, USEFULNESS, TIMELINESS, RELIABILITY OR OTHERWISE. THE ABOVE LIMITATIONS MAY NOT APPLY TO YOU.

## LIMITATION OF LIABILITY

EXCEPT FOR A PARTY'S INDENIFICATION OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL, DAMAGES, OR ANY DAMAGES WHATSOEVER, EVEN IF A PARTY HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHETHER IN AN ACTION UNDER CONTRACT, NEGLIGENCE, OR ANY OTHER THEORY, ARISING OUT OF OR IN CONNECTION WITH THE USE, INABILITY TO USE, OR PERFORMANCE OF THE INFORMATION, SERVICES, PRODUCTS, AND MATERIALS AVAILABLE FROM THIS SITE. THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. BECAUSE SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, OR THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATIONS MAY NOT APPLY.

## INDEMNIFICATION

You agree to indemnify, defend, and hold harmless ICE, its officers, directors, employees, agents, licensors and suppliers (collectively the "Provider") from and against all third party losses, expenses, damages and costs, including reasonable attorneys' fees, resulting from any activity related to your Internet account (including negligent or wrongful conduct), by you or any other person accessing the ICE service using your Internet Site.

**APPLICABLE LAWS**

Your use of ICE Portal shall be governed in all respects by the laws of the state of Florida, U.S.A., without regard to choice of law provisions, and not by the 1980 U.N. Convention on contracts for the international sale of goods. Any cause of action or claim you may have with respect to ICE Portal (including but not limited to the use of the ICE database and services) must be commenced within one (1) year after the claim or cause of action arises. ICE's failure to insist upon or enforce strict performance of any provision of these terms and conditions shall not be construed as a waiver of any provision or right. Neither the course of conduct between the parties nor trade practice shall act to modify any of these terms and conditions

Those who choose to access the ICE database and use the Service from locations outside Florida do so on their own initiative and are responsible for compliance with applicable local laws.

**SCHEDULE H**

## **ICE**Portal **Notable Distribution Partners**

| Direct - GDS / Switches | Static Images via Leonardo |
|---|---|
| **Sabre** / *Travel Network* | Delivery once a week.  Images available across the Sabre Travel Network – Travelocity, Site59, Lastminute, World Choice Travel.* |
| **trust** INTERNATIONAL | Live delivery – Weekly updates. Images integrated in to the Trust Central Reservations System to aide CRO bookings. |
| aMaDEUS | Live delivery static images - updates twice a week.  Images appear on travel agents booking screen Vista and the corporate booking tool Aergo plus internet booking sites. |
| **Pegasus** SOLUTIONS | Live delivery – updates daily. Dynamic delivery to 1,000 of websites globally using Pegasus Netbooker and UltraDirect booking engines. |
| **Worldspan** by Travelport | Delivery once a week.  Images are onwardly distributed to a network of corporate and leisure internet sites |
| **Galileo** by Travelport | Delivery three times a week.  Images appear directly on the travel agents booking screen. |

| Direct Partners | Rich Content via ICE Portal |
|---|---|
| **11**th **Hour Vacations**.com | Live link of custom branded digital brochure from ICE – approved updates appear in real time. |
| **A^A** AmericanAirlines **VACATIONS**. | Live link of custom branded digital brochure from ICE – approved updates appear in real time. |
| *AARP* | Live link of custom branded digital brochure from ICE – approved updates appear in real time. * |
| ALLRES | Live link of digital brochure from ICE via Pegasus |
| AMERICAN EXPRESS | Live link of custom branded digital brochure from ICE – approved updates appear in real time.* |
| AMERICAN EXPRESS VACATIONS | Delivered via Travel Impressions |
| AOL | Live link of custom branded digital brochure from ICE – approved updates appear in real time. * |
| **APPLE VACATIONS** America's Favorite Vacation Company | Live link of custom branded digital brochure from ICE – shown on 1,000s of Apple Vacations affiliate sites as well. |
| *away.com* | Delivered via Orbitz |
| **book** .com | Live link of custom branded digital brochure from ICE |
| **CERTIFIED VACATIONS** | Live link of custom branded digital brochure from ICE – includes **Future Vacations**. |
| | Live link of custom branded digital brochure from ICE |

| | |
|---|---|
| **cheapair4u** | |
| **CheapCaribbean.com** LUXURY FOR LESS | Live link of custom branded digital brochure from ICE |
| **cheapOair.com** the only way to go!! | Currently in development |
| **CheapTickets** | Delivered via Orbitz |
| **cleartrip** | Currently in development |
| **cvent** | Currently in development |
| **ebay** | Only showing properties with rich content being sold via Cultuzz on eBay travel. |
| **ebookers.com** | Delivered via Orbitz. |
| **eLong.com** | Delivered via Expedia. |
| **Expedia** | Creation of graphic maps with regularly content synchronization. |
| **Funjet Vacations** DO SOMETHING YOU'LL NEVER FORGET | Live link of custom branded digital brochure from ICE |
| **GOGO** | Live Links of customized digital brochures for GoGo affiliated travel agents. Approved updates appear in real time. |
| **Groople** | Currently in development |
| **GroupTravelPlanet.com** | Currently in development |
| **hotelbook.com** stay independent | Live delivery – updates daily via Pegasus. |
| **Hotel & Travel index** www.htihotellink.com | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **hotels.com** | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **HotelClub** | Delivered via Orbitz |
| **KAYAK** | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **lastminute.com** | Delivery once a week via Sabre.  Images appear on all local language. * |

| | |
|---|---|
| **LIBERTY TRAVEL®** WHERE TRAVEL BEGINS | Live Links of customized digital brochures for Liberty Travel.com. Approved updates appear in real time. |
| **MexicoQuest** I n t e r a c t i v e | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **msn.** travel | Delivered via Orbitz |
| **NORTHSTAR** T R A V E L   M E D I A | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **octopus**travel.com | Delivered via Orbitz |
| **opodo** let the journey begin | Currently in Development |
| THE MARK TRAVEL CORPORATION | Live Links of customized digital brochures for all Mark Travel brands, including, **FunJet, United Vacations, SW Vacations**. |
| **OneTravel.com™** #1 in Travel Deals | One Travel and affiliate are updating their database and ICE content will be re-launched at the Q4 of '08 on **One Travel, CheapSeats, FarrBuzz, Travelong.** |
| **ORBITZ** | Live links of customized digital brochures for Orbitz & affiliate sites |
| **Passport** Online | Live links for several retail networks including - **AAA, American Express, Carlson Wagonlit Travel, Cruise Holidays, Navigant Vacations, Uniglobe, Ensemble Travel Vacation.com** |
| **Pegasus** SOLUTIONS | ICE Portal will host, manage and distribute all rich internet content for hoteliers via Pegs ODD and made available to all pegs distribution channels. |
| **Pleasant Holidays®** | Live links of customized digital brochures for PleasantHolidays.com. Additional distribution to all Pleasant affiliate sites. |
| **P R E V U** | ICE Portal distribution partner provides distribution of ICE content to over 300 travel sites in Asia Pacific. |
| **priceline.com** | Live links of custom digital brochures from Additional channels include: **TravelWeb, HotelWeb, LowestFare, Active Hotels** |
| PROFESSIONAL TRAVEL GUIDE | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **RatesToGo.com** | Delivered via Orbitz |
| **REZCONNECT** | Live link of generic digital brochures and searchable interactive map – claims over 20,000 sites with affiliate **YTB International**. |
| **rooms.com** | Currently in development with **World Travel Holdings.** Live links of digital brochures have been delivered. |
| **SideStep** The leading travel search engine | Live link of custom branded digital brochure from ICE. Approved updates appear in real time. |
| **site 59** | Delivery once a week via Sabre * |
| **SOUTHWEST VACATIONS** | SW Vacations - Live link of custom branded digital brochure from ICE |
| **starCITE** | Live links of custom branded digital brochures. |

29

| | |
|---|---|
| Travel Impressions | Live link of custom branded digital brochure from ICE – approved updates appear in real time. |
| travelocity | Live link of custom branded digital brochure from ICE – approved updates appear in real time. * |
| travelwizard.com | Live link of custom branded digital brochure from ICE |
| tripadvisor | Currently in Development |
| UNITED | United Vacations - Live link of custom branded digital brochure from ICE |
| USAHOTELGUIDE.com | Live link of custom branded digital brochure from ICE – approved updates appear in real time. * |
| VacationClick | Live links showcasing custom digital brochures with ICE Rich Content. Updates appear live. |
| Vacations To Go.com | Live links showcasing custom digital brochures with ICE Rich Content. Updates appear live. |
| VibeAgent | Live links showcasing custom digital brochures with ICE Rich Content. Updates appear live. |
| VacationAccess The Travel Pro's Best Friend | Live links showcasing ICE Rich Content in generic digital brochures – Includes deliver to 85,000 travel agencies. |
| WorldChoiceTravel .com | Live links of generic digital brochures for distribution to their 2,000+ affiliated travel sites. * |
| wwte worldwide travel exchange | Delivered via Expedia |
| YAHOO! TRAVEL | Live link of custom branded digital brochure from ICE – approved updates appear in real time. * |
| zuji | Live link of custom branded digital brochure from ICE – approved updates appear in real time. * |

*Sabre / Travelocity requires additional fees for Rich Media*

## Systems Access Agreement for Contractors

_____ ("Contractor"), is an individual who is employed or otherwise contracted by _____ ("ICE") to perform certain services for InterContinental Hotels Group (IHG)  Contractor hereby agrees as follows:

**WHEREAS**, InterContinental Hotels Group has engaged ICE under an executed agreement, on a non-exclusive basis, to provide certain services to IHG ("Agreement"), which services will be performed by Contractor, as an independent contractor(s),

**NOW, THEREFORE**, in consideration of the privilege of gaining access to certain IHG information systems, including but not limited to, server, network, storage and software systems, ("Systems") as may be designated by IHG from time to time, Contractor agrees as follows:

1. Contractor agrees to and shall abide by the terms and provisions of the Agreement between IHG and ICE, incorporated herein by reference.
2. Contractor agrees to and shall abide by all IHG standard security policies and procedures that are provided to Contractor in writing or orally  (as such policies may be amended from time to time by IHG), with the clear understanding that any violation of the policies shall subject Contractor to loss of all IHG Systems access privileges, removal from the performance of any services for IHG, and any other penalties as may be described in the Agreement between IHG and ICE or that are otherwise available to IHG.
3. Contractor shall not disclose to any other person any logon ID or password, or other confidential IHG Systems access information (e.g., private keys, smart cards, etc.) ("Secure Access Information") issued to Contractor, unless authorized in writing to do so by a IHG information security officer.
4. Contractor shall not obtain, possess, disclose, or use in any manner another person's Secure Access Information, unless authorized in writing by a IHG information security officer. Should Contractor come into possession of a IHG staff member's or another contractor's Secure Access Information, Contractor shall not keep it, keep a record or facsimile of it, or provide or disclose the Secure Access Information to any other person. However, Contractor shall immediately inform the authorized user of the Secure Access Information of Contractor's possession of such, so that the Secure Access Information may be changed, suspended or reissued.
5. Contractor shall not and shall not attempt to access, possess, disclose, or use any IHG, customer, employee, or ICE information to or for which Contractor is not authorized.
6. Contractor shall safeguard all equipment, software and other assets provided to Contractor by IHG and shall use these assets for authorized business purposes only.
7. Contractor shall be responsible for maintaining the security of and for limiting access to any personal computer (PC), peripheral, or software provided to Contractor by IHG.  Contractor shall not obtain or attempt to obtain, use or possess any unauthorized or unlicensed software for use on any IHG PC, or other hardware or device owned by IHG.  Contractor shall not allow unauthorized persons to use any PC, peripheral, or software provided to Contractor by IHG. Contractor shall not use non-IHG owned hardware or software on IHG's network without prior approval of IHG management.
8. Contractor shall not and shall not attempt to access or otherwise obtain information from any IHG Systems or enter into any IHG facility, room or area for which Contractor is not authorized.  Contractor will not abuse or misuse Contractor's authority to gain access to any IHG Systems, facility, room or area.
9. Contractor shall use an approved anti-virus product.  Contractor shall update the signature file at least once a month.  If Contractor encounters a virus that cannot be disabled through the use of the anti-virus software, Contractor shall discontinue use of the infected PC for IHG business.
10. Contractor shall not install software that can be used to circumvent access controls (e.g. password crackers, daemon dialers, keystroke capture software, etc.) on any PC or LAN that Contractor uses or has access to for IHG business, unless authorized in writing by IHG's Information Security Department.
11. Contractor shall immediately report all known, or suspected, security weaknesses or violations to IHG's Information Security Department.
12. Contractor shall not use any IHG network or equipment, including remote access to such, except for purposes of performing authorized services for IHG.
13. Contractor understands and agrees that IHG policies apply to Contractor when telecommuting.
14. Ownership of any materials or other work product created by Contractor in the course of performing services will be determined as set forth in the Agreement and any applicable attachment or schedule.

I certify and acknowledge that I have been advised of my right to seek independent counsel of my choosing in connection with this Systems Access Agreement and I have either done so or waived the right to do so.  I further certify and acknowledge that I have carefully read all of the provisions of this Systems Access Agreement and that I understand and will comply with such provisions.


Print Name: _____    Signature: _____


Date: _____


**_SUPERVISING MANAGER_: RETAIN THIS SIGNED DOCUMENT FOR COMPLIANCE REVIEWS & AUDITS.**

℁ JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**09-60230**
**CIV · ALTONAGA**

**MAGISTRATE JUDGE**
**BROWN**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ICE Portal, Inc. | VFM Leonardo, Inc. |

(b)  County of Residence of First Listed Plaintiff  **Broward**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Harper Meyer
701 Brickell Avenue, Suite 1400
Miami, Florida 33131
(305) 577-3443

Attorneys (If Known)

(d) Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☑ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☑ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☑ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Broward U. 09CV 60230 | Altonaga | S

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | ☐ 950 Constitutionality of State |
| | Employment | ☐ 550 Civil Rights | Application | | Statutes |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | |
| | Other | | Detainee | | |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☑ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case  ☐ YES  ☑ NO        b) Related Cases  ☐ YES  ☑ NO

JUDGE _____        DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Sec. 1332(a)(2); breach of contract, unjust enrichment; tortious interference with business advantage

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $  785,037.50

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE
February 12, 2009

FOR OFFICE USE ONLY

AMOUNT  350.        RECEIPT #  995199        IFP