UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-60230-CIV-ALTONAGA/Brown

ICE PORTAL, INC.,

       Plaintiff,

vs.

VFM LEONARDO, INC.,

       Defendant.
_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, VFM Leonardo, Inc.'s Renewed Motion for Judgment as a Matter of Law (the "Motion") [D.E. 149], filed March 23, 2010.  VFM Leonardo requests judgment as a matter of law against Plaintiff, ICE Portal, Inc., pursuant to Federal Rule of Civil Procedure 50(b).  The Court has considered the parties' written submissions, the relevant portions of the record, and the applicable law.

## I. BACKGROUND[1]

This case involves the struggle between two competitors to win the business of one client, a large hotel chain named International Hotel Group, Inc. ("IHG").  The competitors, ICE Portal and VFM Leonardo, both store and distribute digital images of hotels.  After IHG signed an agreement in December 2008 with VFM Leonardo for a distribution project known as the IC Meetings Project, ICE Portal sued VFM Leonardo for breach of contract and tortious interference with a business

_____

[1]  When considering a motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, the Court must evaluate all of the evidence, together with any logical inferences therefrom, in the light most favorable to the nonmoving party.  *See Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997).  Accordingly, the facts summarized in this Order have been construed in ICE Portal's favor as the non-moving party.

Case No. 09-60230-CIV-ALTONAGA/Brown

relationship.  VFM Leonardo counterclaimed for breach of contract.  But the parties' relationships — both collaborative and non-collaborative — began well before December 2008.

## A.      The Master Services Agreement

In 2004 IHG signed a Master Services Agreement with Leonardo Media, B.V., a Dutch company, to build a digital asset management platform (the "IHG DAM Platform").  (*See* Trial Tr. 169:20–170:1, Feb. 26, 2010 [D.E. 156]; Joint Ex. 10).  IHG used the DAM Platform to manage its hotel images, both for its own websites and for distribution through other channels such as online travel agents.  (*See* Trial Tr. 169:20–170:1, Feb. 26, 2010).  Although IHG owned the hotel images, Leonardo Media, B.V. owned the technology for distributing the images.  (*See id.*).

## B.      The Strategic Partner Agreement and the Addendum to Partnership Agreement

Unrelated to the Master Services Agreement, in October 2007 ICE Portal and "Leonardo" signed a Strategic Partner Agreement.  (*See* Joint Ex. 1).  ICE Portal and Leonardo, competitors in the same industry, agreed to join forces because ICE Portal distributed rich media content (*e.g.*, videos and virtual tours), Leonardo distributed still images, and hotels wanted both.  (*See id.* § 1).  ICE Portal and Leonardo "believe[d] that by jointly offering each others [sic] services — in combination — [they would] deliver greater value to existing and new clients."  (*Id.*).  The Strategic Partner Agreement had a minimum one year term with an option to renew for concurrent periods of one year.  (*See id.* § 12).  In October 2008, ICE Portal and Leonardo renewed the Strategic Partner Agreement.  (*See* Joint Ex. 8).

Also in October 2008, ICE Portal and Leonardo signed an Addendum to Partnership Agreement, also known as the Virtual Tour Agreement.  (*See* Joint Ex. 2).  Under the Virtual Tour

2

Case No. 09-60230-CIV-ALTONAGA/Brown

Agreement, ICE Portal and Leonardo were to synchronize distribution of virtual tour content to online travel channels for Leonardo's client, IHG. (*See id.* at 1). This required Leonardo to grant ICE Portal access to its technology; in other words, the Virtual Tour Agreement obligated Leonardo to allow ICE Portal to integrate into the IHG DAM Platform. (*See* Trial Tr. 96:1–23, Feb. 24, 2010 [D.E. 154]).

The Virtual Tour Agreement also included a change-of-control provision that, if triggered, obligated the parties to perform the Virtual Tour Agreement for one year: "In the event that Leonardo should undergo a change of ownership control, this agreement shall survive for a minimum of [one year]." (Joint Ex. 2 at 2). A "change of control" typically includes either a sale of stock or an assets acquisition (*see* Trial Tr. 228:8–13, Feb. 26, 2010), and both ICE Portal and Leonardo understood "change of ownership control" to mean a sale of stock or an assets acquisition (*see* Trial Tr. 101:8–102:19, Feb. 23, 2010 [D.E. 153]).

For both the Strategic Partner Agreement and the Virtual Tour Agreement, "Leonardo" meant the entire Leonardo organization, which included Leonardo Media, B.V. (the parent company) and multiple subsidiaries. (*See id.* 43:8–44:4; Trial Tr. 77:13–79:11, Feb. 24, 2010). ICE Portal negotiated the Strategic Partner Agreement and the Virtual Tour Agreement without regard to a specific corporate entity (*see* Trial Tr. 78:20–79:5, Feb. 22, 2010 [D.E. 152]; Trial Tr. 100:2–13, Feb. 23, 2010); neither contract defined "Leonardo" as a corporate entity (*see* Joint Exs. 1–2); no one at Leonardo made a distinction between its various subsidiaries (*see* Trial Tr. 100:2–13, Feb. 23, 2010); and ICE Portal did not deal exclusively with any particular subsidiary of Leonardo (*see* Trial Tr. 78:25–79:5, Feb. 22, 2010). For example, ICE Portal routinely interacted with Leonardo's IT

3

Case No. 09-60230-CIV-ALTONAGA/Brown

staff in Israel, who were part of the Israeli subsidiary.  (*See* Trial Tr. 83:25–84:12, 183:17–184:3, Feb. 24, 2010; Trial Tr. 92:10–93:6, Feb. 25, 2010 [D.E. 155]).

**C.      VFM Interactive Purchases Leonardo**

On October 15, 2008, Paoli Boni of VFM Interactive, Inc. and David Elton of Leonardo met to discuss the sale of Leonardo.  (*See* Pl.'s Ex. 23 at 2).  When Mr. Boni and Mr. Elton began discussing Leonardo's obligations under the Strategic Partner Agreement and the Virtual Tour Agreement, Mr. Boni "commented on [ICE Portal's] price being so low" and indicated that he was "happy for ICE [Portal] to lose money" on the Virtual Tour Agreement.  (*See id.*).

Shortly thereafter, in early November 2008, VFM Interactive purchased Leonardo.  (*See* Joint Ex. 9).  As part of the overall acquisition, VFM Interactive purchased substantially all the assets of Leonardo Media, B.V., and several Leonardo Media subsidiaries, including Leonardo Media Services, B.V.  (*See id.*; Pl.'s Ex. 4; Trial Tr. 233:15–234:8, Feb. 26, 2010).  Consequently, VFM Interactive renamed itself VFM Leonardo, Inc.  (*See* Pl.'s Ex. 4).  The sale documents listed the Virtual Tour Agreement as a contract acquired by VFM Leonardo (*see* Joint Ex. 9 at Schedule 2.1(c); Pl.'s Ex. 6); and VFM Leonardo advised ICE Portal that it had been assigned all contracts between Leonardo and ICE Portal and "ha[d] assumed the obligation to perform all of [Leonardo Media, B.V.'s] obligations under all such contracts" (Pl.'s Ex. 4).  VFM Leonardo also acquired, through the acquisition, the technology that supported the IHG DAM Platform.  (*See* Trial Tr. 96:1–8, Feb. 24, 2010).

After the acquisition, VFM Leonardo had the ability to distribute both rich content and still content, and so it no longer needed ICE Portal to distribute rich content.  (*See* Trial Tr. 209:5–6, Feb.

4

Case No. 09-60230-CIV-ALTONAGA/Brown

23, 2010).   Thus, despite advising ICE Portal that VFM Leonardo had assumed Leonardo's obligations under the Virtual Tour Agreement, VFM Leonardo later cancelled the Virtual Tour Agreement and refused to pay two invoices for services ICE Portal provided under the Virtual Tour Agreement.  (*See* Joint Exs. 5–7).

**D.     The IC Meetings Project**

Beginning in November 2007, ICE Portal and Leonardo also had cooperative discussions with IHG regarding rich media production and distribution services known as the IC Meetings Project.  (*See* Trial Tr. 108:2–24, Feb. 23, 2010).  Over the course of a year, the parties defined the terms of the IC Meetings Project and prepared separate agreements for ICE Portal and Leonardo. (*See id.*).  ICE Portal also brought in MeetingMatrix as a partner to support the project.  (*See id.*). Like the Strategic Partner Agreement and the Virtual Tour Agreement, the proposed agreements for the IC Meetings Project required integration between ICE Portal and Leonardo with respect to the IHG DAM Platform.  (*See* Trial Tr. 96:1–19, Feb. 24, 2010).

Given VFM Leonardo's ability to provide both rich and still content, however, VFM Leonardo wanted to pursue the IC Meetings Project without ICE Portal.  On November 12, 2008 — just one week after purchasing Leonardo — Mr. Boni directed his employees to "do everything we can to stop IHG from signing [the IC Meetings Project] with ICE [Portal]."  (Pl.'s Ex. 13 at 1). Specifically, despite knowing VFM Leonardo's integration obligations under the Strategic Partner Agreement and the Virtual Tour Agreement, Mr. Boni instructed his employees to tell IHG that:

- "[i]f the [IC Meetings Project] is given to ICE [Portal], VFM Leonardo will <u>not</u> (repeat NOT) participate in the [IC] Meeting project or integrate ICE [Portal] or Meeting Matrix

Case No. 09-60230-CIV-ALTONAGA/Brown

content into the Leonardo [DAM] platform" (*id.* at 2);

• VFM Leonardo "will not deploy any resources to facilitate the integration of ICE [Portal] and Meeting Matrix into the IHG DAM [Platform]" because "there is nothing in it" for VFM Leonardo and it "will not support [its] competitor" (*id.*); and

• "[i]f we [VFM Leonardo] are the ones doing the media production then we will obviously integrate not only our own viewer but the [MeetingMatrix] stuff as well" (*id.*).

That same day, Joey Egan, a VFM Leonardo employee, contacted Bryson Koehler, an IHG executive, and requested a call between VFM Leonardo and IHG before the parties finalized the contracts for the IC Meetings Project. (*See* Pl.'s Ex. 39). Mr. Egan told Mr. Koehler a meeting was necessary because the acquisition "change[d] the scope of what Leonardo . . . now as VFM Leonardo" could provide for the IC Meetings Project. (Pl.'s Ex. 39). Mr. Koehler, in response, wanted to know if "the technology approach" for the IC Meetings Project had changed. (*Id.*). Mr. Egan advised him that VFM Leonardo would "not allow ICE [Portal] to connect to the IHG DAM [Platform] seamlessly," and that "[t]his would eliminate the true single point of entry." (*Id.*). Although Mr. Koehler was "open to hearing more," he emphasized "anything that changes us from having a single point of entry and management will be a deal breaker." (Pl.'s Ex. 40). Mark Charlinski, another VFM Leonardo employee, also told IHG on November 12 that if IHG signed an agreement with ICE Portal for the IC Meetings Project, VFM Leonardo would not support its competitor, *i.e.*, VFM Leonardo would not allow ICE Portal to integrate into the IHG DAM Platform. (*See* Pl.'s Ex. 42; Trial Tr. 148:7–150:2, Feb. 25, 2010).

On November 18, 2008, ICE Portal signed the proposed Consulting Services Agreement for

Case No. 09-60230-CIV-ALTONAGA/Brown

the IC Meetings Project and sent it to IHG for counter-signature.  (*See* Joint Ex. 3; Trial Tr. 175:21–25, Feb. 23, 2010).  IHG never signed the agreement with ICE Portal.  Over the next few days, Mr. Boni tried "to work around" the Virtual Tour Agreement (Pl.'s Ex. 47), even though he admitted VFM Leonardo was bound by the Virtual Tour Agreement, including its integration obligations, by virtue of the change-of-control provision (*see* Trial Tr. 211:8–23, Feb. 26, 2010). One month later, in December 2008, IHG signed a contract with VFM Leonardo for the IC Meetings Project.  (*See* Joint Ex. 4).

ICE Portal lost the IC Meetings Project because VFM Leonardo refused to allow ICE Portal to integrate into the IHG DAM Platform, and it was not possible for ICE Portal to provide services for the IC Meetings Project without VFM Leonardo's cooperation.  (*See* Trial Tr. 105:2–5, Mar. 1, 2010 [D.E. 157]; Trial Tr. 96:1–8, Feb. 24, 2010).

> [VFM Leonardo] used [leverage] against ICE [Portal] because IHG needed [its images]. [IHG] needed those images [on the IHG DAM Platform].  Without the images, [IHG] can't sell hotels and there was no way that [IHG could] migrate [the images] to any new platform in any timely manner at any expensive cost, and [VFM Leonardo was] aware of that.  So, the only one that was caught in the middle here was ICE Portal.

(Trial Tr. 105:15–20, Mar. 1, 2010).  ICE Portal's employees also repeatedly testified that ICE Portal's tortious interference claim is based on VFM Leonardo's stated unwillingness to integrate. (*see* Trial Tr. 98:7–99:7, Feb. 22, 2010; Trial Tr. 46:14–50:20, 62:19–63:25, 141:24–142:20, 144:20–23, 146:23–153:14, 149:5–150:11, 186:22–187:15, Feb. 23, 2010; Trial Tr. 91:13–92:14:, Feb. 24, 2010; Trial Tr. 87:2–97:7, 143:5–20, Mar. 1, 2010).

In addition, the proposed Consulting Services Agreement for ICE Portal was nonexclusive; IHG therefore could have signed a contract with VFM Leonardo at any time for the very same

7

services. (*See* Trial Tr. 123:15–124:4, Feb. 24, 2010). But VFM Leonardo did not want IHG to sign the Consulting Services Agreement with ICE Portal because VFM Leonardo knew ICE Portal was for sale and wanted to purchase ICE Portal at a discount. (*See* Pl.'s Ex. 13 at 1; Trial Tr. 56:11–57:24, Mar. 1, 2010).

**E.    The Jury Verdict**

On March 2, 2010, the jury returned a verdict in favor of ICE Portal on its two claims, breach of contract and tortious interference with a business relationship. (*See* Special Verdict Form [D.E. 137]). For the breach of contract claim, the jury determined VFM Leonardo breached the Virtual Tour Agreement by (1) failing to pay two invoices ICE Portal issued and (2) cancelling the Virtual Tour Agreement in violation of the change-of-control provision. (*See id.* at 1–2). The jury awarded ICE Portal $115,037.50 in damages. (*See id.* at 1). For the tortious interference claim, the jury determined VFM Leonardo engaged in improper conduct "separate and independent of any alleged breach of the Strategic Partner Agreement, Partner Agreement Addendum or other contract between the parties in competing for the IC Meetings Project." (*Id.* at 4). On this claim, the jury awarded ICE Portal $275,000.00 in damages. (*See id.* at 5). Finally, the jury ruled in favor of ICE Portal on VFM Leonardo's breach of contract counterclaim. (*See id.*).

VFM Leonardo now renews its request for judgment as a matter of law on both ICE Portal's breach of contract claim and its tortious interference claim.

## II.  LEGAL STANDARD

VFM Leonardo's Motion is governed by Federal Rule of Civil Procedure 50(b). Under this standard, "[a] district court should grant judgment as a matter of law when the plaintiff presents no

legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005). Conversely, the court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case." *Id.* Although the court looks "'at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts.'" *Campbell v. Rainbow City*, 434 F.3d 1306, 1312 (11th Cir. 2006) (quoting *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000)).

The court "should review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–51 (2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

While the court affords due deference to the jury's findings, it is axiomatic that such findings are not automatically insulated from review by virtue of the jury's careful and conscientious deliberation or detailed answers to special interrogatories. Rule 50 "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 447 (2000) (citation and internal

quotation marks omitted). A jury verdict is not entitled to "the benefit of unreasonable inferences, or those at war with the undisputed facts." *United Fire & Cas. Ins. Co. v. Garvey*, 419 F.3d 743, 746 (8th Cir. 2005) (citation and internal quotation marks omitted); *accord Fenner v. Gen. Motors Corp.*, 657 F.2d 647, 650–51 (5th Cir. 1981) ("[A] jury may properly reconstruct a series of events by drawing an inference upon an inference. The inference relied upon, however, must be reasonable. An inference may be unreasonable if it is at war with uncontradicted or unimpeached facts." (citations and internal quotation marks omitted)).[2]

## III.  ANALYSIS

### A.    ICE Portal's Breach of Contract Claim

The jury found VFM Leonardo breached the Virtual Tour Agreement because it cancelled the Virtual Tour Agreement in violation of the change-of-control provision and refused to pay two invoices. VFM Leonardo asserts it is entitled to judgment as a matter of law because ICE Portal presented no evidence from which a reasonable jury could conclude that VFM Leonardo's asset acquisition triggered the change-of-control provision.

The change-of-control provision provides: "In the event that Leonardo should undergo a change of ownership control, this agreement shall survive for a minimum of [one year]." (Joint Ex. 2 at 2). The Court previously held the change-of-control provision is ambiguous because it is unclear whether "Leonardo" refers to a specific corporate entity, such as Leonardo Media, B.V., or

---

[2] *See, e.g.*, *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 483 (5th Cir. 1976) ("A careful examination of both the trial transcript and the documentary evidence . . . compels the conclusion that a significant portion of the testimony given by the plaintiff's witnesses was incredible as a matter of law."); *Ralston Purina Co. v. Hobson*, 554 F.2d 725, 728–29 (5th Cir. 1977) ("[C]ompletely self-serving testimony, unsupported by other evidence and in the teeth of universal experience, will not support a jury verdict.").

Case No. 09-60230-CIV-ALTONAGA/Brown

to the entire Leonardo organization without regard to a specific corporate entity. (*See* Jan. 15, 2010 Order [D.E. 103] at 2). In addition, the "Leonardo" question makes the rest of the provision ambiguous: if "Leonardo" is a corporate entity, "change of ownership control" could reasonably mean a sale of stock; but if "Leonardo" is not restricted to a specific corporate entity, "change of ownership control" could reasonably mean a sale of stock *or* a sale of assets. (*See id.*). These ambiguities presented an issue of fact regarding the parties' intent. *See Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.*, 513 So. 2d 218, 219 (Fla. 1st DCA 1987) ("Where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment.").

ICE Portal presented ample evidence for the jury to conclude: (1) the parties intended "Leonardo" to mean the entire Leonardo organization rather than a specific corporate entity; (2) they intended "change of ownership control" to include a sale of assets; and (3) "Leonardo" therefore underwent a change of ownership control when VFM Interactive acquired substantially all the assets of Leonardo Media, B.V. and several of its subsidiaries. For example, ICE Portal's witnesses testified ICE Portal negotiated the Strategic Partner Agreement and the Virtual Tour Agreement without regard to a specific corporate entity; neither contract defined "Leonardo" as a specific corporate entity; and ICE Portal did not work exclusively with one Leonardo entity. In addition, "change of control" typically means either a sale of stock or an assets acquisition, and ICE Portal and Leonardo understood "change of ownership control" to include both. Construing the evidence in the light most favorable to ICE Portal, the jury could reasonably have concluded the change-of-control

11

Case No. 09-60230-CIV-ALTONAGA/Brown

provision obligated VFM Leonardo to perform the Virtual Tour Agreement for at least one year, which it failed to do.

Thus, VFM Leonardo's request for judgment as a matter of law on this claim is denied.

**B.      ICE Portal's Tortious Interference Claim**

In Florida, a plaintiff must prove three elements to recover on a claim for tortious interference: "(1) [t]he existence of a business relationship under which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship by the defendant; and (3) damage to the plaintiff as a result of the tortious interference with the relationship." *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1534 (11th Cir. 1985).

VFM Leonardo asserts it is entitled to judgment as a matter of law for two reasons: first, its conduct was protected by the competition privilege; and second, the economic loss rule bars ICE Portal's tortious interference claim.  The crux of VFM Leonardo's arguments is that it did nothing more than breach its integration obligations under the Strategic Partner Agreement and the Virtual Tour Agreement.

1.      The Competition Privilege

After a "plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to justify the propriety of its conduct." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (citing *Greenberg v. Mount Sinai Med. Ctr.*, 629 So. 2d 252, 256 (Fla. 3d DCA 1993)).  One defense to a tortious interference claim is the competition privilege — "the right of competitors to compete for customers." *Id.* at 1158.  To establish the competition privilege, a defendant must show: "(1) the [plaintiff-third party]

12

Case No. 09-60230-CIV-ALTONAGA/Brown

relationship concerned a matter involved in the competition between [the defendant] and [the plaintiff]; (2) it did not employ improper means; (3) it did not intend to create or continue an illegal restraint of competition; and (4) its purpose was at least in part to advance its interest in competing with [the plaintiff]." *Id.* at 1159. ICE Portal asserts the competition privilege does not protect VFM Leonardo because VFM Leonardo used improper means to win the IC Meetings Project.[3]

"Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged." *Johnson Enters. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998). Improper means include physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct, and threats of illegal conduct. *See G.M. Brod*, 759 F.2d at 1533–36; *Morsani v. Major League Baseball*, 663 So. 2d 653, 655–57 (Fla. 2d DCA 1995); FLORIDA STANDARD JURY INSTRUCTIONS IN CIVIL CASES § 408.6 (2010).

Although Florida law recognizes multiple types of improper means of competing for business, the competition privilege bars a plaintiff from turning a defendant's broken promise not to compete into a claim for tortious interference. *See Austral*, 262 F.3d at 1159–60; *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1104–05 (11th Cir. 1983). For example, in *Austral* the plaintiff, ISS, filled orders for aviation wire for its customers through the

---

[3] ICE Portal also asserts throughout its Response that VFM Leonardo intended to financially injure ICE Portal so that it could purchase ICE Portal at a discount. (*See* Pl.'s Resp. to Def.'s Renewed Mot. for J. as a Matter of Law ("*Resp.*") [D.E. 161] at 10, 12, 13). ICE Portal does not explicitly argue, however, that VFM Leonardo failed to satisfy the fourth prong of the competition privilege. And, to the extent ICE Portal is arguing VFM Leonardo acted solely for non-competitive reasons, ICE Portal does not explain why, under Florida law, VFM Leonardo's desire to purchase ICE Portal was an improper purpose. Rather, ICE Portal's Response is devoted to identifying improper *conduct*, not improper *purpose*. The remainder of this Order therefore focuses on the second prong of the competition privilege, improper means.

13

defendant, Austral. 262 F.3d at 1154. To prevent Austral from discovering the identity of its clients, ISS used a freight forwarder. *Id.* After three years of operating like this, Austral told ISS that it would stop selling wire to ISS unless ISS disclosed the identify of its clients. *Id.* ISS agreed, but only after Austral promised not to use the information to sell directly to ISS's clients. *Id.* Once Austral obtained the client information, however, Austral refused to fill orders for ISS and contacted ISS's customers directly. *Id.* The Eleventh Circuit held Austral's actions — pursuing ISS's customers after promising not to compete with ISS — were protected by the competition privilege.[4] *Id.* at 1160.

VFM Leonardo's conduct is analogous to the defendant's conduct in *Austral*. Just as ISS and Austral agreed not to compete for customers, ICE Portal and VFM Leonardo — two competitors — agreed not to compete but to collaborate: under the Virtual Tour Agreement, ICE Portal and VFM Leonardo agreed to integrate their technologies to provide better services to IHG. And just as Austral breached its agreement not to compete by contacting ISS's customers directly, VFM Leonardo stopped integrating with ICE Portal (thereby breaching the Virtual Tour Agreement) so that VFM Leonardo could pursue a business relationship with IHG — the IC Meetings Project — without any help from ICE Portal.

ICE Portal contends, however, that *G.M. Brod* controls here. In *G.M. Brod* the court held

---

[4] *Austral* relied on *Royal Typewriter*, which the Eleventh Circuit found factually indistinguishable. *See Austral*, 262 F.3d at 1160. In *Royal Typewriter* the defendant-manufacturer promised the plaintiff-distributor that if the plaintiff became a dealer for the defendant's product, the defendant would not compete with the plaintiff in Miami. 719 F.2d at 1097. The defendant subsequently contacted the plaintiff's customers in Miami and invited them to purchase equipment directly from the defendant. *Id.* at 1097–98. The court held the defendant was protected by the competition privilege and noted the defendant's promise not to compete with the plaintiff "establishes a cause of action for breach of the alleged contract or, perhaps, for fraud, not for tortious interference." *Id.* at 1105.

the defendant committed tortious interference because, in addition to breaching a management contract, the defendant used improper means: it "arranged for [the plaintiff's] employees to resign and to be employed by [the defendant] on the same day and evicted [the plaintiff] from its exclusive in-house rental space." 759 F.2d at 1535. ICE Portal asserts that, like the defendant in *G.M. Brod*, VFM Leonardo used three improper means to win the IC Meetings Project: misrepresentations, threats, and economic coercion.

      *a.*    *Misrepresentations*

ICE Portal and VFM Leonardo agree that misrepresentations are improper conduct not protected by the competition privilege.[5] (*See Mot.* at 11; *Resp.* at 5). A misrepresentation is a false statement or omission of a material fact. *See Berg v. Capo*, 994 So. 2d 322, 327 (Fla. 3d DCA 2007); *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001). ICE Portal asserts VFM Leonardo misrepresented its integration obligations by telling IHG that VFM Leonardo would not integrate with ICE Portal if IHG awarded ICE Portal the IC Meetings Project. But VFM Leonardo's statements are not, as a matter of law, misrepresentations.

VFM Leonardo did not make a false statement concerning its integration obligations or its intent to stop integrating. ICE Portal presented no evidence that VFM Leonardo told IHG anything

---

[5] Although Florida law now recognizes misrepresentations are improper means, *see Boldstar Technical, LLC v. Home Depot, Inc.*, 517 F. Supp. 2d 1283, 1289 (S.D. Fla. 2007) (noting improper conduct includes misrepresentations) (quoting FLORIDA STANDARD JURY INSTRUCTIONS IN CIVIL CASES § 408.6, formerly § 7.2); *Slip-N-Slide Records, Inc. v. TVT Records, LLC*, 2007 U.S. Dist. LEXIS 80788, at *15–18 (S.D. Fla. Oct. 31, 2007) (Torres, Mag. J.) (finding evidence of misrepresentations sufficient to support jury verdict for the plaintiff on its tortious interference claim), *Austral* and *Royal Typewriter* appear to hold otherwise. *See Austral*, 262 F.3d at 1160; *Royal Typewriter*, 719 F.2d at 1105. Since the parties agree misrepresentations are improper means, however, the proper interpretation of *Austral* and *Royal Typewriter* on this issue is not relevant.

Case No. 09-60230-CIV-ALTONAGA/Brown

— one way or another — about its integration obligations under the Virtual Tour Agreement; and all the evidence suggests VFM Leonardo in fact intended to stop integrating (and did cease integrating) with ICE Portal. Thus, VFM Leonardo's affirmative statements to IHG were true.

Neither did VFM Leonardo omit a material fact: ICE Portal presented no evidence that VFM Leonardo's integration obligations were material to IHG. The *only* evidence presented was: (1) IHG wanted a single point of entry for its DAM Platform; and (2) IHG would not get a single point of entry if it awarded the IC Meetings Project to ICE Portal. In other words, although IHG cared whether it had a single point of entry for the IHG DAM Platform, there was no evidence IHG cared whether VFM Leonardo breached its integration obligations in order to provide that single point of entry. VFM Leonardo's integration obligations were not material to IHG.

For the foregoing reasons, VFM Leonardo did not make misrepresentations to IHG.

> b.     *Threats and Economic Coercion*

Although ICE Portal addresses threats and economic coercion as independent types of improper conduct, both are premised on the same facts: (1) IHG would have needed to invest in a new, costly technology platform if it awarded the IC Meetings Project to anyone but VFM Leonardo; and (2) IHG's year-long negotiations with ICE Portal would have been for naught if VFM Leonardo would not allow ICE Portal to integrate into the IHG DAM Platform. Based on these facts, ICE Portal maintains "VFM Leonardo explicitly threatened to render IHG's technology platform worthless by refusing to support the IC Meetings Project in any way unless and until the IC Meetings Project was awarded to VFM Leonardo." (Resp. at 11). ICE Portal asserts this threat was improper conduct under *Morsani v. Major League Baseball*, 663 So. 2d 653 (Fla. 2d DCA 1995).

Case No. 09-60230-CIV-ALTONAGA/Brown

In *Morsani* the plaintiffs alleged that on multiple occasions they attempted to purchase a Major League Baseball ("MLB") team and that the defendants, who were associated with Major League Baseball, used threats, intimidation, and conspiratorial conduct to prevent the plaintiffs from buying a team. *Id.* at 655–57. The plaintiffs first attended an MLB meeting and sought advice from the defendants about buying the Minnesota Twins and relocating the team to the Tampa Bay area. *Id.* at 655. The defendants supported the relocation; and so the plaintiffs leased a stadium, negotiated to purchase a controlling interest in the Twins, and executed a contract to purchase a minority interest in the Twins. *Id.* The closing for the contract, however, "was conditioned upon prior approval by the owners of other American League teams, as the Constitution of the American League required." *Id.* Thereafter, the defendants caused the majority interest-holders to sell their share in the Twins to a third party, demanded the plaintiffs assign their minority interest to the same third party, and further demanded the plaintiffs forbear legal remedies for their $15 million loss on the assignment. *Id.* at 655–56. When the plaintiffs refused, the defendants threatened "that plaintiffs would never own an interest in a major league baseball team, and that there would never be a major league baseball team in the Tampa Bay area," unless the plaintiffs agreed to the defendants' demands in exchange for an ownership interest in an expansion team. *Id.* at 656.

Several years later, when the plaintiffs attempted to purchase the Texas Rangers, they met similar interference, demands, and threats. *Id.* Shortly thereafter, some of the defendants informed the plaintiffs that, consistent with the plaintiffs' prior forbearance, the plaintiffs would be awarded an expansion team. *Id.* The defendants then eliminated the plaintiffs from contention for the promised expansion team by: (1) demanding that an important investor relinquish his interest in the

17

Case No. 09-60230-CIV-ALTONAGA/Brown

proposed expansion team; and (2) prohibiting the plaintiffs from obtaining financial backing from certain investors. *Id.* The court held these threats, intimidation, and conspiratorial conduct were improper because "the defendants' approval rights were exercised outside the context of the proper exercise of their rights." *Id.* at 657.

Contrary to ICE Portal's assertion, VFM Leonardo's statements to IHG are not like the threats and intimidation in *Morsani* for two related reasons. First, *Morsani* did not involve "the right of competitors to compete for customers." *Austral*, 262 F.3d at 1158. Rather, *Morsani* involved the proper scope of the defendants' rights to approve the sale of current teams or award expansion teams. Second, unlike *Morsani*, VFM Leonardo's "threats" did not exceed the scope of its privilege to interfere. In *Morsani* the defendants had no right to threaten the plaintiffs that they would never own an MLB team and that an MLB team would never play in the Tampa Bay area. Here, however, VFM Leonardo's only "threat" was that it would not integrate with ICE Portal — *i.e.*, that VFM Leonardo would not cooperate with a competitor — if IHG awarded ICE Portal the IC Meetings Project. Under the competition privilege, VFM Leonardo had no obligation to integrate (or cooperate) with ICE Portal, and so the "threat" of non-integration was nothing more than a return to competition. ICE Portal's counsel even admitted that, absent VFM Leonardo's contractual obligations, VFM Leonardo had no duty to grant its competitors access to the IHG DAM Platform. (*See* Trial Tr. 122:4–19, Mar. 1, 2010).

ICE Portal contends, however, that VFM Leonardo threatened more than non-integration: VFM Leonardo also threatened to render IHG's technology platform worthless if IHG did not award VFM Leonardo the IC Meetings Project. In other words, from a financial perspective IHG would

18

Case No. 09-60230-CIV-ALTONAGA/Brown

have had to invest in a new, costly technology platform and IHG's year-long negotiations with ICE Portal and VFM Leonardo would have been a waste. But, as explained, VFM Leonardo still had no duty — except a contractual one to ICE Portal — to allow anyone to access its technology, including the IHG DAM Platform. And to the extent ICE Portal is arguing that VFM Leonardo "leveraged" its position as the host of the IHG DAM Platform, *i.e.*, that VFM Leonardo illegally tied access to the IHG DAM Platform (the tying product) to the IC Meetings Project (the tied product), ICE Portal explicitly abandoned a tortious interference claim based on antitrust violations. (*See* Pl.'s Resp. to Def.'s Mot. *in Limine* [D.E. 102] at 3).

For the foregoing reasons, VFM Leonardo did not, as a matter of law, engage in threats or economic coercion. And, because ICE Portal presented no evidence VFM Leonardo used *any* improper means other than a breach of contract to win the IC Meetings Project, *Austral* and not *G.M. Brod* controls here. Therefore, VFM Leonardo is entitled to judgment as a matter of law on ICE Portal's tortious interference claim.

    2.   <u>Economic Loss Rule</u>

Since the competition privilege bars ICE Portal's tortious interference claim, the Court need not decide whether the claim is also barred by the economic loss rule.

## IV. CONCLUSION

Consistent with the foregoing analysis, it is

**ORDERED AND ADJUDGED** as follows:

    1.   The Motion **[D.E. 149]** is **GRANTED IN PART**.

    2.   VFM Leonardo is granted judgment as a matter of law on ICE Portal's tortious

Case No. 09-60230-CIV-ALTONAGA/Brown

interference claim.  Judgment will be entered separately.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of June, 2010.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

20